**The DOW CHEMICAL COMPANY,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 19–83C.**

United States Court of Federal Claims.

Sept. 1, 1994.

Arthur M. Lieberman, Lieberman, Rudolph & Nowak, New York City, for plaintiff.

B. Frederick Buchan, Washington, DC, with whom was Vito J. DiPietro, Director, Commercial Litigation Branch, Civ. Div., and Stuart E. Schiffer, Acting Asst. Atty. Gen., U.S. Dept. of Justice, for defendant.

## *OPINION*

SMITH, Chief Judge.

This case comes before the court on the following motions for summary judgment:

(1) Cross motions for summary judgment on the effectiveness of Dow's termination of the license to the United States.

(2) Cross motions for summary judgment on whether to restrict plaintiff's recovery to money damages for partial breaches of contract.

(3) Cross motions for summary judgment on whether the statute of limitations bars plaintiff's claims.

(4) Cross motions for summary judgment on whether three particular activities

by the government also infringe Dow's patent.

(5) Cross motions for summary judgment on whether the government's use of Dow's invention constitutes demonstration or experimental use.

In a previous opinion this court found Dow's patent valid, and certain government action to constitute patent infringement. *The Dow Chemical Company v. United States,* 20 Cl.Ct. 623 (1990). This court also entered an order dated November 9, 1992, granting plaintiff's motion for summary judgment that the license issued to the government was terminated for material breach, and that Dow was entitled to treat the license as terminated *ab initio.* At the same time, the court denied defendant's cross motion asserting the contrary. Part I of this opinion supplements the court's previous order.

Oral argument was held on the remaining issues July 30, 1993, at which time the court ruled from the bench that it would grant plaintiff's motion for summary judgment that three particular activities by the government also infringe Dow's patent (referred to at oral argument as Issues 6, 7, and 8). Part IV of this opinion supplements the court's bench ruling on this issue.

In Part II of this opinion the court grants, in part, defendant's motion for summary judgment. Because plaintiff terminated the license contract, count II (the contract count) of the complaint is dismissed. However, the court denies defendant's request to dismiss the infringement count.

In Part III the court denies defendant's motion for summary judgment, and grants plaintiff's cross motion that the statute of limitations does not bar plaintiff's infringement claim.

In Part V the court denies defendant's motion for summary judgment that its use of Dow's invention constituted mere experimental or demonstration use, and grants plaintiff's cross-motion asserting the contrary.

Accordingly, it appears to the court that the only issue remaining is the calculation of damages for patent infringement based on a reasonable commercial royalty rate. If the parties are unable to settle in light of this opinion the court will set trial on the issue of damages.

## FACTS

The detailed history and description of Dow's invention can be found in this court's previous opinion and will be repeated here only as necessary. *See The Dow Chemical Company v. United States,* 20 Cl.Ct. 623 (1990). In short, Dow's invention is essentially a pressurized slurry pump injection system used to fill subterranean mine voids. This process helps prevent surface subsidence and thus has greatly benefited society. It has been successfully employed on numerous occasions.

In 1970, Dow granted the government a provisional royalty-free license to use its invention for experimental and demonstration use. The license was granted by Dow as part of a larger contract in which Dow agreed to use its invention on a pilot project known as Rock Springs. The invention was successfully used at Rock Springs, and as a result, in 1972 Dow and the government entered into a second contract where Dow would use its invention at another test project known as Scranton. As part of the Scranton project, Dow and the government entered into a new licensing arrangement. The new contract granted the government a royalty-free license to use Dow's invention for government purposes on federal lands, and granted a royalty-free right to use the process to inject up to 2.5 million cubic yards of material for government purposes on non-federal lands. Thereafter, the government was granted a royalty-bearing license not to exceed 25 percent of a reasonable commercial rate. A patent was eventually issued to Dow for its invention on June 18, 1974 ('039 patent).

By letter dated July 9, 1975, Dow requested an accounting from the government for royalties due under the Scranton license, and proposed a royalty rate.[1] The parties negoti-

---

1. Dow proposed that a reasonable commercial royalty rate would be 8% of the contract price for

any particular project where the invention was used. Therefore, under the license agreement

ated issues of the reasonableness of the royalty rate, patent validity, scope, and infringement throughout late 1975 and all of 1976. To Dow's surprise, by letter of December 28, 1976, the government stated that it believed no royalties were due because the government had not practiced the invention covered by the '039 patent. The government concluded that its activity did not constitute any discernable infringing use of the Dow process because the Dow patent was limited by a scientific formula defining minimum injection rate. *See Dow*, 20 Cl.Ct. at 626 (discussing the scientific aspects of '039 patent). Nevertheless, discussions and meetings continued in 1977 and 1978.

At Dow's request the government voluntarily undertook an intensive, careful, and active reconsideration of its position expressed in its letter of December 28, 1976. By letter dated November 2, 1978, the government delineated its final position that no compensation was due. The government stated that three "seriously litigable" issues existed: (1) whether the government was practicing the process covered by the Dow patent; (2) whether the Dow patent was valid; and (3) whether any license issued by Dow was viable.

As a result of the government's claim of invalidity Dow filed for reissue of its patent. Over the government's strenuous opposition, the Patent and Trademark Office found Dow's patent without error, and affirmed its validity as originally issued. By letter dated February 15, 1982, Dow again requested the government honor its obligations to pay royalties after the Patent Office's decision. The government responded on December 20, 1982, in a one paragraph letter, that it was unwilling to change its final position of November 2, 1978.

On January 17, 1983, Dow filed the instant complaint plead in the alternative. Count I seeks a reasonable royalty for patent infringement, and count II seeks damages for the government's breach of the 1972 license contract. Defendant answered in the alternative by alleging the '039 patent was invalid, and that if valid, the government's activity was outside the scope of the '039 patent. The government also asserted that no royalties were due because the Scranton license was defective. On January 10, 1985, Dow gave the government formal notification that it was terminating the 1972 license contract for material breach because of the government's constant and unequivocal refusal to pay royalties.

The court eventually held a lengthy trial on liability in which each side presented their best case example from the allegedly infringing projects. Dow chose its best case for infringement, and the government chose its best case for non-infringement. On June 8, 1990, the court issued an opinion finding Dow's patent valid, and that the '039 patent was infringed even by the government's best case for non-infringement. *See The Dow Chemical Company v. United States*, 20 Cl. Ct. 623 (1990).

After the court issued its opinion on liability, the government challenged Dow's termination of the Scranton license so it could take advantage of the favorable royalty rate (i.e., 25% of a reasonable commercial rate) in the license for the purpose of calculating damages. Accordingly, Dow filed a motion for summary judgment that it justifiably terminated the 1972 license contract for material breach, and was entitled to treat the license as terminated *ab initio* by calculating infringement damages as 100 percent of a rea-

---

the government would owe royalties of 2% (25% of the commercial rate).

By letter of August 22, 1975, the government responded that no royalties were currently due because the 2.5 million cubic yard royalty-free limit was not expected to be reached until November 1, 1975. In this letter the government also disagreed with Dow's proposed royalty rate and invited a second proposal from Dow. By letter of September 15, 1975, Dow responded that it believed the initially proposed royalty rate was reasonable and fair under the circum-

stances, and asked that it be informed when the government reached the limit of 2.5 million cubic yards. By letter dated September 26, 1975, the government reiterated its belief that Dow's initial proposal was unreasonable, and enclosed a table showing quantities used by the government as of August 1, 1975. On November 12, 1975, Dow responded and offered to adjust the royalty-rate in its initial proposal. On January 23, 1976, the government responded favorably to Dow's new proposal and requested a meeting to resolve the issue and to clear up other matters.

sonable royalty rate. The government filed a cross-motion for summary judgment contesting the effectiveness of Dow's termination, and asserting that any recoverable damages must be calculated according to the 25 percent royalty rate set forth in the Scranton license. After briefing and oral argument, the court issued an order on November 8, 1992, granting plaintiff's motion and denying defendant's cross-motion. The only remaining issue appeared to be determining a reasonable royalty rate. However, the government has since raised additional issues of jurisdiction, infringement, and the statute of limitations that are before the court in these motions.

## DISCUSSION

### I.

The court concluded in its previous order dated November 8, 1992, that the 1972 license agreement must be considered effectively terminated *ab initio* due to defendant's failure to pay any royalties, the parties course of conduct, as well as the policy considerations in *Lear v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).

In *Lear v. Adkins*, the Supreme Court rejected the principle of "licensee estoppel," and held that a patent licensee may assert patent invalidity as a defense to a contract action for nonpayment of royalties. *Warner-Jenkinson Company v. Allied Chemical Corporation*, 567 F.2d 184, 187 (2d Cir.1977) (citing *Lear*). In *Lear* the Court set forth the following policy rationale to support its holding:

> Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Licensees may often

be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists [2] without need or justification. We think it plain that the technical requirement of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued.

*Lear v. Adkins*, 395 U.S. at 670–71, 89 S.Ct. at 1911 (footnote added).

In the court's view this policy rationale has little or no applicability to the instant case. Here the licensee is the United States government not a private entity that could arguably be "muzzled" by the threat of a contract action for the nonpayment of royalties. In fact, the government's zealous litigation effort in this case proves the contrary.

The government argues that the policy rationale in *Lear* supports its position that Dow cannot terminate the license, and that any damages must be limited to the favorable royalty rate set forth in the 1972 Scranton license. If a licensee challenging the validity of the patent held by its licensor wishes to hedge, and thus preserve favorable terms under its license contract, it must pay the royalties when they come due or risk ultimate infringement liability if their patent validity challenge fails.

> [Lear's] public policy statement does permit a licensee to cease payments due under a contract while challenging the validity of a patent. *It does not permit the licensees to avoid facing the consequences that such an action would bring.* The holding of *Lear* only prevents the affirmative enforcement by the licensor of the royalty payment provisions of the license

---

**2.** It should be noted that since *Lear* intellectual property case law and academic literature has considerably developed so that referring to a patent as a "monopoly" is viewed as highly pejorative. *See e.g.*, 1 IRVING KAYTON, PATENT PRACTICE, ¶ E. *Patents: Property Versus Monopoly* (5th ed. 1993) (citing *American Hoist & Derrick v. Sowa & Sons*, 725 F.2d 1350, 1367 (Fed.Cir.1984) ("[P]atent rights are not [even] legal monopolies in the antitrust sense of the word"); *Carl*

*Schenck, A.G. v. Nortron Corp.*, 713 F.2d 782, n. 3 (Fed.Cir.1983) ("It is but an obfuscation to refer to a patent as 'the patent monopoly' ..."); *Nickola v. Peterson*, 580 F.2d 898, n. 25 (6th Cir.1978) ("The patent right, solely that of excluding others, is the fundamental element of all human rights called 'property.' The statutory, and therefore proper, characterization is not 'patent monopoly,' but 'patent property.' ")).

agreement while the patent's validity is being challenged by the licensee.

*Cordis Corporation v. Medtronic, Inc.,* 780 F.2d 991, 995 (Fed.Cir.1985) (emphasis added).

> If [licensees] wish to continue to invoke the protections of their licensing agreements, they should be required to continue paying their royalties to the [licensor]. Ultimately, all royalties paid after the filing of [a complaint challenging patent validity] may have to be returned to the [licensee].... At present, [licensees] already have the option of withholding royalties and thereby breaching the licensing agreement; of course, they would then run the risk of an injunction if they should lose on the merits. *It would not be fair for [a licensee] to be allowed simultaneously to reap all the benefits of the licensing agreement and to deprive the licensor of all his royalties.* Patents are presumed to be valid, ... until invalidity is proven, the patentee should ordinarily be permitted to enjoy the fruits of his invention.

*Cordis Corporation v. Medtronic, Inc.,* 780 F.2d 991, 995 (Fed.Cir.1985) (emphasis added) (citing *Warner–Jenkinson,* 567 F.2d at 188; *Nebraska Engineering Corp. v. Shivvers,* 557 F.2d 1257 (8th Cir.1977)).[3]

In the court's view the government's argument is a misapplication of *Lear* in evaluating the rights and obligations of the parties and the interest of the public. Although the policy rationale of *Lear* does not prevent Dow from terminating the license contract with the government, the court must still examine the facts and circumstances of this case to decide whether Dow was within its rights to treat as terminated or terminate the license agreement.

▇▇ It is hornbook law that a patent license contract can be rescinded for breach of its essential terms. RIDSDALE ELLIS, PATENT ASSIGNMENTS AND LICENSES § 765 (2d ed.

1943) (citing *St. Paul Plow Works v. Starling,* 140 U.S. 184, 196, 11 S.Ct. 803, 807, 35 L.Ed. 404 (1891)); *see also* ERNEST BAINBRIDGE LIPSCOMB III, LIPSCOMB'S WALKER ON PATENTS, *Licenses* § 20:35, p. 127 (3d ed. 1987) (citing *Automotive Products Corp. v. Wolverine Bumper & Specialty Co.,* 15 F.2d 745 (6th Cir.1926); *American Street Car Advertising Co. v. Jones,* 122 F. 803 (C.C.N.Y. 1903)). This is true even where the contract makes no provision for cancellation by the licensor, so long as the breach is in a matter considered essential to the continuance of the contract. ELLIS, PATENT ASSIGNMENTS AND LICENSES §§ 779, 784 (2d ed. 1943); *see also* LIPSCOMB, LIPSCOMB'S WALKER ON PATENTS, *Licenses* §§ 20:30 & 20:35, p. 118 & 128 (3d ed. 1987). When termination is sought due to the failure of the licensee to pay royalties the licensee's conduct must be such as to indicate an intention to repudiate the contract. ELLIS, PATENT ASSIGNMENTS AND LICENSES § 789 (2d ed. 1943); *see also* LIPSCOMB, LIPSCOMB'S WALKER ON PATENTS, *Licenses* § 20:35, p. 128 (3d ed. 1987). That is, nonpayment of royalties, *unless long continued,* is not ordinarily regarded as sufficient to terminate the license in the absence of a covenant to that effect. *Id.*

> However, where the circumstances show that it is not simply a question of collecting compensation, but that the nonpayment [of royalties] is but an overt act, evidencing with other facts an intention not to duly practice the invention, the real purpose of the license agreement has been repudiated, and the inventor should have it back from the party, who thus either does not consider it of value, or who seeks to pick the brain of the inventor without deeming itself bound to pay for what has been taken from him by reason of the contract.

ELLIS, PATENT ASSIGNMENTS AND LICENSES § 789 (2d ed. 1943) (citing *Hazeltine Research Corp. v. Freed–Eisemann Radio Corp.,* 3 F.2d 172 (E.D.N.Y.1924)).

---

3. *See also* ERNEST BAINBRIDGE LIPSCOMB III, LIPSCOMB'S WALKER ON PATENTS, *Licenses* § 20:30, p. 121 (3d ed. 1987) (a licensee may challenge the validity of a patent but royalties must be paid to retain the license, citing *Warner–Jenkinson* ); *cf. Foster v. Hallco Manufacturing Co., Inc.,* 947 F.2d 469 (Fed.Cir.1991) (holding that *Lear* does not abro-

gate general principles of res judicata or the res judicata effect of a consent decree regarding patent validity); Rochelle Cooper Dreyfus, *Dethroning Lear: Licensee Estoppel and the Incentive to Innovate,* 72 Va.L.Rev. 677 (1986) (discussing the viability of *Lear* in light of much evolved intellectual property law principles).

When a license contract is breached by the licensee the licensor has the option of terminating the contract by treating the licensee's action as an offer to rescind and suing on the patent for infringement. ELLIS, PATENT ASSIGNMENTS AND LICENSES §§ 779 & 782 (2d ed. 1943). When a license is lawfully canceled the parties are relegated to their status before the granting of the license, and when a license has been declared forfeited by the licensor it cannot be revived or have its validity restored by the subsequent tender of royalties due, or by the licensor's subsequent attempts to obtain payment. ELLIS, PATENT ASSIGNMENTS AND LICENSES §§ 770 (2d ed. 1943); see also LIPSCOMB, LIPSCOMB'S WALKER ON PATENTS, Licenses § 20:30, p. 120 (3d ed. 1987). Moreover, the injured party does not change the effect of a repudiation by urging the repudiator to perform. RESTATEMENT (SECOND) OF CONTRACTS § 257 (1979).

In this case the government is the licensee and has never paid any royalties to Dow. As of November 2, 1978, the government clearly and unequivocally expressed its intention to never pay royalties to Dow. Not only did the government contest the validity of Dow's patent, but it also challenged the viability of the license contract itself. The government's conduct in this case constitutes classic breach of contract by repudiation. The government renounced all of its obligations under the license agreement, and in the court's view forfeited all of its rights contained in the license agreement. Moreover, Dow did not change the effect of the government's repudiation by urging the government to perform. Accordingly, the court finds that Dow has lawfully, and for good cause, terminated its license contract with the government. Because Dow's termination abrogates the contract to the extent it remained unperformed, and because the government has never performed under the license contract, Dow's termination has ab initio effect—that is, the termination renders the license contract void from the beginning, as if it had never existed.

Defendant disputes whether the termination has ab initio effect in part by arguing that it would be an unauthorized exercise of equitable jurisdiction for this court to "rescind" the license contract. To the contrary, in the court's view it is not an exercise of equitable jurisdiction, "rescission" or otherwise, for this court to make a finding as to the legal effect of the actions already taken by the government with respect to Dow.[4] However, to the extent it can be construed as an exercise of equitable jurisdiction, it is merely incidental to this court's determination of infringement damages under 28 U.S.C. § 1498. Stated differently, finding that Dow's lawful termination has ab initio effect is merely incidental to this court awarding Dow infringement damages based on a reasonable commercial royalty rate under 28 U.S.C. § 1498. Heinemann v. United States, 620 F.2d 874, 877, 223 Ct.Cl. 479 (1980); Pauley Petroleum, Inc. v. United States, 591 F.2d 1308, 1315, 219 Ct.Cl. 24 (1979) (the assumption that the Court of Claims has no equity jurisdiction is an "ancient but inaccurate shibboleth").

## II.

The parties have filed cross-motions for summary judgment on whether to restrict plaintiff's recovery of money damages to partial breaches of contract. Defendant seeks dismissal of plaintiff's infringement count, and dismissal in part of plaintiff's breach of contract count. However, it appears to the court that defendant's argument is backward and somewhat disingenuous. Having lost the trial on patent validity and infringement, the government seeks to limit its damages to the amount specified in the license contract despite the fact it has wholly repudiated its obligations under the license contract. In the court's view the legal result defendant seeks is the exact opposite the law and facts require. The court finds that

---

4. The government is generally correct that this court lacks jurisdiction to award damages under a pure theory of restitution, quasi-contract, or contract implied-in-law. See e.g., Aetna Casualty and Surety Company v. United States, 655 F.2d 1047, 1059–60, 228 Ct.Cl. 146 (1981); Montego Bay Imports, Ltd. v. United States, 25 Cl.Ct. 639, 645 n. 7 & 656 (1992). However, here Dow is not employing any of these theories as a basis for recovery. Dow's entitlement to recover money damages, if any, is based solely on 28 U.S.C. § 1498.

plaintiff's contract count must be dismissed in its entirety, and that plaintiff's infringement claim is ripe for a determination of damages.

According to defendant, plaintiff has a remedy for partial breach of contract under 28 U.S.C. § 1491, which precludes any cause of action under 28 U.S.C. § 1498. The idea being that a "licensee" cannot by definition be an "infringer." Defendant contends that because it at one time had a "license" it can never be an "infringer" under 28 U.S.C. § 1498.[5] The court finds the defendant's argument unreasonable, and contrary to the wording of the statute.

> Section 1498 states in pertinent part:
> Whenever an invention described in and covered by a patent of the United States is used ... by ... the United States without license ... or *lawful right* to use ... same, the owner's remedy shall be ... for the recovery of his *reasonable and entire compensation* for such use....

28 U.S.C. § 1498(a) (emphasis added).

■ While the present existence of a valid license would logically preclude a cause of action under § 1498, the mere execution of a license is not a perpetual bar to a § 1498 claim. Dow can properly treat the license as extinguished because the government has never performed and has repudiated the license contract. As the court explained in Part I, Dow's termination has *ab initio* effect due to the government's total repudiation of the license contract from its inception. Accordingly, the court can conclude only that the government did not have "lawful right" to use Dow's patented process without paying royalties when they came due. If Congress had intended that the mere existence of a "license" should be a perpetual bar to a § 1498 claim, it would not have added the phrase "or lawful right." The court cannot properly ignore the phrase "or lawful right" as mere surplusage, but instead is obliged to interpret the statute as written. *See e.g., Reiter v. Sonotone Corp.,* 442 U.S. 330, 339,

99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979) ("In construing a statute [the court] is obliged to give effect, if possible, to every word Congress used. Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings."); *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955) (" 'The cardinal principle of statutory construction is to save and not to destroy.' It is our duty 'to give effect, if possible, to every clause and word of a statute.' "); *Bath Iron Works Corp. v. United States,* 27 Fed. Cl. 114, 125 (1992) (discussing the basic tenents of statutory construction).

■ Moreover, accepting the government's argument would be fundamentally unfair. The government is essentially asking to have its cake and eat it too. That is, the government wants to be able to refuse to pay royalties called for under the license contract while challenging Dow's patent, but if it loses, the government wants to be able to fall back on the lower royalty rate contained in the license contract to calculate damages. The law does not provide the government with such a lopsided advantage. In sum, the government's use of Dow's patented process "without license or lawful right" constitutes an eminent domain taking of a license under the Fifth Amendment requiring just compensation. *See e.g., Motorola, Inc. v. United States,* 729 F.2d 765, 768 (Fed.Cir.1984); *De Graffenried v. United States,* 29 Fed.Cl. 384, 386 (1993). As such, defendant's motion for summary judgment to dismiss plaintiff's infringement count is denied, and plaintiff's cross-motion is granted.

■ However, plaintiff's contract claim must be dismissed. The complaint as originally filed contained two counts pled in the alternative. Since then Dow has recognized the termination of the license contract, rendering count II of the complaint baseless. Accordingly count II must be dismissed in its entirety.

---

5. The government cites Judge Robinson's recent opinion in *Blais v. United States,* 31 Fed.Cl. 422, 427 (1994), to support this proposition. However, *Blais* did not involve the effect of a license termination. In *Blais,* contrary to this case, the government had paid for the right to use the invention, only the patent holder and subcontractor received no money because of the insolvency of the prime contractor. This is a far different situation from the instant case.

## III.

The parties have also filed cross motions for summary judgment on whether the statute of limitations bars plaintiff's claims. Two statutes govern the time limit within which suit must be filed against the government for patent infringement under 28 U.S.C. § 1498. 28 U.S.C. § 2501 states in pertinent part:

Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed *within six years* after such claim first accrues.

28 U.S.C. § 2501 (emphasis added).

35 U.S.C. § 286 provides in relevant part: Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint ... for infringement. . . .

. . . . .

In the case of claims against the United States Government for use of a patented invention, the period before bringing suit, up to six years, between the date of receipt of a written claim for compensation by the department or agency ... having authority to settle such claim, and the date of mailing by the Government of notice to the claimant that his claim has been denied shall not be counted as part of the period referred to in the preceding paragraph.

35 U.S.C. § 286.

Dow's complaint was filed on January 17, 1983. Defendant argues that any alleged infringement claims that first accrued prior to January 17, 1977, are time barred. However, 35 U.S.C. § 286 clearly provides a mechanism by which a would-be claimant can toll the six-year statute of limitations pending review of its claim by the appropriate governmental agency. *See e.g., Custer v. United States,* 622 F.2d 554, 557–58, 224 Ct.Cl. 140 (1980) (citing *Fairchild Engine & Airplane Corp. v. United States,* 285 F.2d 131, 133, 152 Ct.Cl. 352 (1961); *Calhoun v. United States,* 453 F.2d 1385, 197 Ct.Cl. 41 (1972). The purpose behind the statute is to provide the government time to carefully consider potential claims, and possibly correct its mistakes, before having to proceed with costly litigation.

Tolling under 35 U.S.C. § 286 begins once the government receives "a written claim for compensation" by the claimant that is sufficiently detailed so as to provide the government a realistic opportunity to consider and settle the claim. *See e.g., Dynamics Corp. of America v. United States,* 5 Cl.Ct. 591, 598 (1984), *rev'd in part on other grounds,* 766 F.2d 518 (Fed.Cir.1985). In this case plaintiff made such a written demand for compensation on July 9, 1975. The government presumably received Dow's demand by July 12, 1975. Accordingly, the six-year statute of limitations was tolled on approximately July 12, 1975, until the government mailed its denial of plaintiff's claim.

The government corresponded with Dow on December 28, 1976, initially denying Dow's claim for compensation based solely on the fact that the government did not believe it was practicing the invention covered by Dow's patent. However, as a result of further correspondence and negotiations between the parties the government voluntarily undertook an intensive and careful reconsideration of its position. On November 2, 1978, the government finally denied Dow's claim and cited two additional reasons in support of its position: (1) Dow's patent was invalid, and (2) the viability and life of any license issued was questionable.

In 1982, Dow again asked the government to reconsider its position. However, this time the government refused stating that the "Department sees no reason to change its position on this matter as set forth ... November 2, 1978." Accordingly, the court concludes that tolling of the six-year statute of limitations ended on November 2, 1978.

Because the statute of limitation was tolled approximately 39 months, the six-year statute of limitations is extended for an equivalent period of time. That is, plaintiff may recover for any infringement claims first accruing approximately nine years and 3 months prior to January 17, 1983, or October 17, 1972. Because Dow's patent was not issued until June 18, 1974, it may recover for

any infringement claims that accrued during the life of its patent.

The government argues that it would be inequitable to use November 2, 1978, as the date the government denied Dow's claim. According to the government this would add a requirement that a denial be "final." Such an interpretation, according to the government, would permit claimant's to extend the statute of limitations *ad infinitum* by simply asking the government to reconsider its position. The court does not find this argument convincing.

First, the facts of this case clearly indicate that Dow did not ask the government to reconsider its position of December 28, 1976, in an underhanded attempt to extend the statute of limitations. Moreover, the government's argument cuts both ways. If a "denial" for the purposes of 35 U.S.C. § 286 does *not* mean "final" denial then the government could engage in the same type of conduct it attributes to would-be claimants. That is, the government could string along a claimant with equivocal denials until the statute of limitations expires. Moreover, the government can easily prevent the hypothetical abuse it fears by simply stating that its decision is "final," and refusing to reconsider its position. This is precisely what occurred in this case. When asked in 1982, the government refused to reconsider its "final" position expressed on November 2, 1978. If Dow had been deceptively trying to extend the statute of limitations, its attempt would clearly fail. Accordingly, the court does not adopt the government's wooden reading of the statute, and presumes Congress intended that the "denial" means "final denial" in 35 U.S.C. § 286. This is also consistent with a basic and fundamental preference for settlement rather than litigation in our public policy. To the extent the government's position would discourage discussion and encourage litigation it must also be disfavored.

After considering these statutes as applied to the facts and circumstances of this case the court is convinced that plaintiff's infringement claim is not time barred. Accordingly, defendant's motion is denied, and plaintiff's cross-motion is granted.

## IV.

In order to address the parties' cross-motions for summary judgment as to whether three particular activities also infringe Dow's patent, the court must revisit the facts of Dow's invention.

Dow's '039 patented invention is a process for backfilling subterranean mine voids with solid material. The goal of this backfilling is to prevent surface subsidence by filling empty and abandoned mines with as much solid material as possible. Prior to Dow's invention blind flushing was predominantly used to backfill mines that were either unsafe to enter or inundated with water. Blind flushing involves drilling many boreholes into mine voids from the surface. A slurry of water and solid material is then poured into the mine void through the boreholes resulting in a somewhat conical pile of material directly beneath the borehole. The shortcomings of this process were the large number of boreholes needed, and the relatively small amount of solid material which could be placed into each borehole. Dow's invention remedied these shortcomings.

Dow's invention requires pumping a slurry of water and solids through a closed pressurized system of conduits leading into an underground void.

See Dow Chemical Co. v. United States, 20 Cl.Ct. 623, 626 (1990). As portrayed above, the benefit of Dow's invention is the formation of a stable mound of solids on the mine floor that can spread horizontally until the empty mine is substantially filled to the roof with solids. This decreases the number of boreholes needed to fill mine voids, and greatly increases the amount of fill that can be placed through each borehole.

During the previous trial the court, by stipulation of the parties, limited trial to the issue of patent infringement and the defense of invalidity. With respect to infringement, each party chose its own "best case" project from plaintiff's list of pumped slurry projects. The Dow Chemical Company v. United States, 20 Cl.Ct. 623 (1990). These projects were the Pittston Avenue/Hickory Street project, Dow's "best case" for infringement; and the Dunmore/Throop Street project, the United States' best case for non-infringement.

After a lengthy trial, this court on June 8, 1990, found plaintiff's U.S. Patent No. 3,817,-039 (the "'039 Patent") valid and infringed by each of the accused exemplary projects. On December 21, 1992, this Court delineated the remaining defenses of the United States for summary judgment disposition, and as-signed specific issues to each of the parties. The issue of damages was reserved. Of the issues relating to infringement, the parties resolved several by stipulation, leaving the following issues proffered by the United States:

*Issue 6:* For each borehole, do injections made prior to the time the pressure at the borehole top first exceeds atmospheric infringe?

*Issue 7:* Do injections made through boreholes not having an unbroken casing which extends all of the way to the void infringe?

*Issue 8:* Do injections made through boreholes not having an unbroken, sealed casing of the type described in the liability opinion and which do not extend to a ledge within ten feet of the void roof infringe?

 The court finds that the issues of infringement addressed in Issues No. 6, 7 and 8—relating to pressure and casing with respect to the remaining accused projects—are subsumed in and disposed of by this court's January 8, 1990, decision. That decision found that both plaintiff's "best case" for infringement and defendant's "best case" for non-infringement in fact infringed plaintiff's '039 Patent. The crux of the court's holding was that each project taken as a

whole infringed, and not that merely a particular aspect of each project infringed. *See Dow*, 20 Cl.Ct. at 644. The government may not now substitute for its choice of a best case, other projects, or aspects of the *same* project, which it now contends do not infringe the '039 Patent. Having already determined that defendant's "best case" infringes the '039 Patent, this court concludes that each of the other pumped slurry projects also infringe the '039 Patent. However, the government's position is perhaps even weaker than an attempt to retry the project chosen. It now appears that the government is seeking to retry pieces of the previous trial, while disregarding the other evidence. It is analogous to a company that infringed the first TV set claiming the screen face does not infringe because it is merely a window and the set body doesn't infringe because it is merely a cabinet! By this logic only an invention made of never before seen matter and wholly and totally novel parts would be entitled to patent protection. Such a proposition hardly needs refutation.

In arguing the non-infringement of the other projects, the government relies on a 1985 "Bifurcation Order" signed by former Chief Judge Kozinski. But that order clearly envisioned that the government would choose its best case for non-infringement, and not a randomly selected or an unrepresentative case. Any other construction would turn the infringement trial into an academic exercise with no application to the rest of the proceedings. It would have wasted the court's, the plaintiff's and the government's own time and resources.

 Contrary to the government's contention, the "best case" procedure did not improperly shift the burden of proof to the government. The only "burden" borne by the government was in deciding which project it regarded as its best case, and the government obviously chose the project that it believed was the clearest case of non-infringement. Once that choice was made, it was Dow's burden to prove this project infringed, which in this court's view Dow clearly did.

After the trial on validity and infringement, it remained to be determined which of the accused projects were true pumped slurry projects, having the characteristics of the representative projects found to constitute infringement. Upon review of documentation furnished by the government, Dow apparently determined that certain accused projects did not infringe the patented pumped slurry process, and accordingly stipulated with the government to drop those projects from the case.[6] This is what the court expected would occur in light of its previous opinion. However, the court is convinced that to try the issue of infringement for each pumped slurry project would be a monumental waste of tax dollars and a highly unfair burden on the plaintiff in light of the trial already held. Even Arthur Miles, the government's own witness, admits that all the pumped slurry projects are functionally the same. Therefore, the court concludes that the infringement Issues No. 6, 7 and 8 are subsumed in this court's June 8, 1990 opinion, and grants summary judgment in favor of plaintiff and denies defendant's cross-motion.

Notwithstanding the above, however, the court will address the specifics of each of the infringement issues proffered by the government.

### A. Issues 7 and 8

 The government contends that there are a variety of principal casing configurations found among the backfilling projects which differed from the configurations used at the two test-case projects.[7] These variant

---

6. Dow has thus foregone any claim that the patent-in-suit is infringed by unsealed boreholes (Issue 3), siphoned injections (Issue 4), pneumatic/hydraulic modes of operation (Issue 5), and gravity flushed injections or controlled flush injections made during pumped slurry projects (Issues 9 and 10).

7. The government noted a number of differing casing configurations, including the following three examples:

 (i) casing that is suspended down to the level of the roof of the void (whether in its original position or after being pulled upwardly from a lower bed) but that does not rest on a ledge;

configurations, the government argues, do not infringe the '039 patent claims. The court's prior opinion, however, was not as narrow as the government suggests. It did not limit its finding of infringement to the precise casing configurations at the two test-case projects. Rather, the substance of the court's holding was that *any* borehole and casing configuration that constituted a closed pressurizable system—and met the other claims limitations—would infringe the '039 Patent.

The '039 claims do not require, or even refer to pipeline casing. Indeed, not even the "Preferred Embodiments of the Invention" section refers to casing the boreholes:

In the practice of the present invention a *conduit* is first provided connecting a suitable work surface with the void to be filled. The *conduit* can be made by drilling a substantially vertical bore from the surface of the earth to connect with the void [as shown in the diagram of the patent, *supra*] or other suitable connections can be made, e.g., above the roof of the void or the like. The *conduit* is however, connected to the void in such manner that a closed pressurized system is provided between the void and the injection equipment, e.g. pump, when the suspension is injected therein

'039 Patent, col. 3, lines 46–56 (emphasis added).

The government has made no argument that the term "conduit" necessarily means casing. Nor does the government argue that only casing pipe could serve the purposes of a sealed conduit, which is to maintain pressure and prevent the slurry from escaping before reaching the borehole. It is against both the evidence at trial and common logic to insist that only casing pipe extending fully

to the void could satisfy the '039 claims. The evidence suggests solid rock strata often provides an equally good sealed conduit. *See* Dow App.Ex. 2, Miles Tr. p. 50. Further, the function of the conduit is to deliver slurry under various pressures. This can be done in various ways.

The government misses the essence of the '039 Patent, and this court's June 8, 1990 opinion, as requiring casing to within 10 feet of the void. The court explained its view at oral argument that the '039 claims do not require any particular casing configuration or any casing at all, if a sealed conduit is otherwise provided. The essence of the invention is a closed pressurized system injecting slurry through a sealed conduit. *See* 20 Cl.Ct. at 632 ("The crucial innovation of the Stewart invention was the lining of the borehole to the void with a closed pipe *acting as a conduit*.") (emphasis added).

The government also draws mistaken conclusions from the manner in which this court distinguished the prior art in its previous opinion. In determining whether a particular prior art patent or project provided a closed pressurized system, the court necessarily looked at all of the relevant evidence. Any reference to casing pipe in the court's previous opinion must be understood in the context of the specific backfilling project under discussion.[8]

In sum, this court's previous opinion may have occasionally referred to casing as if it were an element of the '039 claims. Such references were inadvertent; there is no requirement in the claims, nor is it necessary to distinguish the prior art, that the sealed conduit of the '039 claims be cased to within any particular distance of the void. Borehole casing would provide such a closed system as might solid rock strata. What is essential about the '039 Invention is its use of a sealed, and therefore pressurizable, conduit.

(ii) casing that is suspended down to some distance above the roof of the void; and
(iii) casing that extends to and rests upon a ledge position of more than 10 ft. above the roof of the void.

8. For example, that the pipe in the Magnuson system did not extend all the way to the void is *one* important piece of evidence in determining that the system was not closed, nor intended to be closed, along with the evidence of the pipes jumping out of the ground. *See* 20 Cl.Ct. at 631. It is inaccurate to infer from this that the pipe-

line must extend all the way to the void, when a sealed conduit could be provided by solid rock strata. Similarly, when the court distinguished the Peterman's Corners and Upper Tyrone Projects, it noted that the *"conduits"* did not extend completely to the top of the void", and the "slurry would proceed through various crevices." *See* 20 Cl.Ct. at 639. It was the failure to case *through porous strata* that prevented the system from being closed, not the absence of casing per se.

The government also misconstrues the court's previous infringement analysis. That a typical infringing borehole extended all of the way to the void—or to within 10 feet—does not mean that all injections, to infringe, must have been made through such borehole configurations. This would be like arguing that if a court finds a device having four gears infringes a claim requiring a plurality of gears, then only devices having four gears infringe. In analyzing the parties' best cases for their respective positions, the court was merely addressing representative examples of how the claims limitations were met. Other configurations infringe as well, as long as they comprise a series of sealed conduits sufficient to provide a closed pressurized system and meet the other claim limitations.

In sum, after considering the briefs and arguments of the parties, the court grants summary judgment in favor of plaintiff on Issues No. 7 and 8, and denies defendant's cross-motion.

## B. Issue 6

The government argues that no infringement of the '039 process can occur until pressure is first registered at the top of the borehole. That is, until positive pressure develops at the borehole top, the slurry pump is being used only to deliver the slurry to the top of the borehole where gravity takes over without any extra dynamic pressure being applied.

The argument misconstrues the '039 process. The closed pressurized system of the '039 Patent does not contemplate that pressure always be registered at the borehole, nor did this court's opinion so hold. The crucial feature of the invention is that it exerts such pressure during the appropriate phase of the injection process. In its typical mode of operation, pressure would only appear intermittently as the mound in the void is progressively built up and broken down under the pressure of the injected slurry. As the court articulated at oral argument, the process must be understood as a whole, not as a series of discrete moments. Accordingly, infringement is present throughout. For that reason, the *Lemelson* case, 752 F.2d 1538 (Fed.Cir.1985), is of no support to the government. While it is of course true that only actual use of a method claim infringes the method, the '039 method, as noted, does not require the continuous application of pressure to the mound in the void; nor does it require the continuous registration of pressure at the borehole. The '039 method is employed as soon as pumping begins through a closed pressurized system (i.e., capable of exerting pressure when and as required). In fact, the effectiveness of the invention comes from the dynamic process of continuously changing pressure as the mound is built up and broken down in repeated cycles, growing ever larger until it fills the void. Accordingly, the court grants plaintiff summary judgment with respect to Issue No. 6, and denies defendant's cross-motion.

For the foregoing reasons, the court finds the following accused projects literally infringe the '039 Patent: [9]

| Project | Contractor | Contract |
|---|---|---|

(Contracts with the U.S. Bureau of Mines (BOM) or its successor, the office of Surface Mining Reclamation and Enforcement (OSM):

| | | |
|---|---|---|
| Albright | C & S Excavating Co. | K5120082 |
| Archbald | Empire Contracting Co. | KO166159 |

9. Even if the projects performed by the government had not constituted literal infringement, the government could still be liable for infringement under the doctrine of equivalents. *See e.g., Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983); *Timmington v. United States,* 29 Fed.Cl. 731, 735 (1993). Under the doctrine of equivalents, an accused product that does not literally infringe a claim may yet be found an infringement if it performs substantially the same function in substantially the same way to obtain the same result as the claimed process. *Hughes,* 717 F.2d at 1361 (citing *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950)). The doctrine is judicially devised to do equity because to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless gesture. The essence of the doctrine is that one may not practice a fraud on a patent.

| Project | Contractor | Contract |
|---|---|---|
| Dickson City | Empire | KO155156 |
| Dunmore/Throop * | Empire | KO177095 |
| Eddy Creek | Stearns Service Co., Inc. | KO144112 |
| Green Ridge II | Empire | KO133111 |
| Jermyn | Stearns | KO188075 |
| Jessup | Empire | KO166105 |
| Minooka–Cedar E. | Stearns | KO177143 |
| Moosic | Stearns | KO166195 |
| N. Main Ave. | Empire | KO188031 |
| Old Forge/Taylor | No. 1 Contracting Corp. | KO188135 |
| Olyphant | P & Z Co., Inc. | KO155035 |
| Pear Street | Stearns | KO177033 |
| Philo Street | Empire | K5130033 |
| Pittston/Hickory * | No. 1 Contracting | KO177107 |
| Rock Springs (2nd Large Scale) | WHAN Engr. & Constr., Inc. | KO243003 |
| Rock Springs (3rd Large Scale) | M.J. Bober Co. | KO263008 |
| S. 6th Avenue | Frank Irey, Jr., Inc. | K5130129 |
| Taylor | Empire | KO144113 |
| Tripp Park I | C & S | KO188050 |
| Tripp Park II | SBA/Fletcher & Sons, Inc. | KO199107 |
| Wilkes–Barre/Scr. Airport | Stearns | KO199114 |

* The parties were directed to each present one project from Plaintiff's list of accused projects, for which Plaintiff was to prove infringement. Plaintiff chose to present the Pittston/Hickory project as its best case for infringement, while defendant chose the Dunmore/Throop project as its best case of non-infringement. See *Dow Chemical Co. v. United States*, 20 Cl.Ct. at 644.

---

## V.

The last cross-motions for summary judgment before the court concern whether the government's use of Dow's invention constitutes demonstration or experimental use.

On August 13, 1970, Dow granted the federal government a license as part of the Rock Springs backfilling contract ("License I"). License I granted the government a royalty-free, non-exclusive, irrevocable license to use Dow's invention (i) for all federal government purposes on federal lands, and (ii) for experimental and demonstration uses. Dow used its invention on the Rock Springs project to place 20,000 cubic yards of sand into underground voids through a single injection hole. As such, the Rock Springs project was a successful experiment and demonstration of Dow's new invention.

On May 11, 1972, Dow granted the federal government a second license as part of the Scranton backfilling contract ("License II"). License II granted the government a royalty-free right to use the invention (i) for all federal government purposes on federal lands, and (ii) a royalty-free right to use the invention to inject up to 2.5 million cubic yards of fill for government purposes on non-federal lands, and a royalty-bearing license thereafter not to exceed 25 percent of a reasonable commercial rate. License II did not contain a similar provision regarding experimental or demonstration use. At Scranton, Dow used its invention to inject 450,000 cubic yards of material into two local mine voids. After this successful demonstration of Dow's invention the government undertook a massive program of mine backfilling projects.[10] These projects involved awarding contracts through the competitive bidding process to several different independent contractors. The government also made and distributed thousands of copies of a 30 minute film entitled the "The Moving Earth" extolling the Dow process as a major advance in the technology of subsidence control capa-

---

10. The program involved injecting approximately nine million tons of material into mine voids over a period of approximately 12,000 working days at dozens of competitively-bid projects at a cost of approximately 45 million dollars.

ble of solving subsidence problems associated with dry as well as inundated mines.

However, the government contends Dow's invention was used only on a "demonstration or experimental" basis at the projects listed below.[11] Accordingly, the government argues that its use of Dow's process at these projects was "royalty-free" pursuant to the terms of License I. The court does not agree for two independent reasons.

 First, in the court's view the execution of License II superseded by implication License I. *See Harrison Western Corp. v. United States,* 792 F.2d 1391, 1393 (9th Cir. 1986); *Mitsubishi Aircraft International, Inc. v. Brady,* 780 F.2d 1199, 1202 (5th Cir. 1986); *Wigton v. Rosenthall,* 747 F.Supp. 247, 249 (S.D.N.Y.1990); *George Foreman Associates, Ltd. v. Foreman,* 389 F.Supp. 1308, 1315–16 (N.D.Cal.1974); *see also Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 736 F.Supp. 1281, 1283 (S.D.N.Y.1990); *VJK Productions, Inc. v. Friedman/Meyer Productions, Inc.,* 565 F.Supp. 916, 921 (S.D.N.Y.1983). Both li-

censes were granted pursuant to contracts that involved the experimental and demonstration use of Dow's invention at Rock Springs and Scranton. Both licenses covered the same subject matter; the respective rights and obligations of the government and Dow with respect to future use by the government of Dow's invention. Moreover, as the testing of Dow's invention progressed successfully, it would be logical and consistent with the intent of the parties to revisit their licensing arrangement to reflect Dow's belief that it was entitled to fair compensation, and the government's public policy interest in purchasing the right to employ Dow's technological breakthrough on a widespread basis. It was in this context that License II was executed as part of the Scranton contract. License II is comprehensive, fully describing the parties' contractual relationship. Accordingly, the court can only conclude that the implied intent of the parties was to abrogate and extinguish License I in favor of License II. *See Harrison Western Corp.,* 792 F.2d at 1393.[12]

---

11. These projects are as follows:

| Project | Contractor | Contract |
| --- | --- | --- |
| (Contracts with the U.S. Bureau of Mines (BOM)): | | |
| Archbald | Empire Contracting Co. | KO166159 |
| Dickson City | Empire | KO155156 |
| Dunmore/Throop | Empire | KO177095 |
| Eddy Creek | Stearns Service Co., Inc. | KO144112 |
| Green Ridge II | Empire | KO133111 |
| Jermyn | Stearns | KO188075 |
| Jessup | Empire | KO166105 |
| Minooka Pilot/Demo. | Stearns | HO133060 |
| (Minooka injections made under Pennsylvania Contract SL–438) | | |
| Minooka–Cedar E. | Stearns | KO177143 |
| Moosic | Stearns | KO166195 |
| N. Main Ave. | Empire | KO188031 |
| Old Forge–Taylor | No. 1 Contracting Corp. | KO188135 |
| Olyphant | P & Z Co., Inc. | KO155035 |
| Pear | Stearns | KO177033 |
| Pittston/Hickory | No. 1 Contracting | KO177107 |
| Rock Springs (2nd Large Scale) | WHAN Engr. & Constr., Inc. | KO243003 |
| Rock Springs (3rd Large Scale) | M.J. Bober Co. | KO263008 |
| Taylor | Empire | KO144113 |
| Tripp Park I | C & S Excavating Co. | KO188050 |
| Tripp Park II | SBA/Fletcher & Sons, Inc. | KO199107 |
| Wilkes–Barre/Scranton Airport | Stearns | KO199114 |

12. The government also asserts this court terminated *ab initio* License II, and that therefore License I is somehow revived. This argument, whether by mistake or design, mischaracterizes this court's November 8, 1992, order. As the court has previously explained in Part I of this opinion, License II was lawfully terminated by Dow for material breach; the government's steadfast repudiation of its obligations under the license. It is only because the government never performed under the license contract that Dow's termination has *ab initio* "effect." Once the contract was terminated all unperformed obligations were cancelled. In sum, License II extinguished License I, and License II was lawfully terminated by Dow for material breach. The

██ Second, even if License I survived the execution of License II, it would be fanciful indeed for the court to adopt the government's view that its extensive and pervasive use of Dow's invention was merely "experimental or demonstration" use, under any reasonable interpretation of these words. The thrust of the government's argument is that when Congress appropriated money for these projects it labelled the projects as "demonstrations," and that the government subsequently put up signs at the projects that said "demonstration." However, if this is the legal test for whether the accused projects constitute "experiments" or "demonstrations," the government could use Dow's invention royalty-free whenever, wherever, and for whatever purpose the government so desired provided it labelled it a "demonstration" or "experiment." Under the government's interpretation, the compensation scheme contained in License II is rendered meaningless.

In addition to the *reductio ad absurdum* nature of this argument by the government, it is inconsistent with the plain meaning of the phrase "experimental and demonstration" use. By using this language in License I, the parties intended to contract for something akin to the judicially created "experimental use" exception to patent infringement. *See Roche Prods. v. Bolar Pharmaceutical Co.*, 733 F.2d 858, 861, *cert. denied,* 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed.2d 117 (1984); *Pitcairn v. United States,* 212 Ct.Cl. 168, 547 F.2d 1106 (1976), *cert. denied,* 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978); *Douglas v. United States,* 181 USPQ 170, 1974 WL 20548 (Ct.Cl. Trial Division 1974), *aff'd,* 206 Ct.Cl. 96, 510 F.2d 364 (1975); *Deuterium Corp. v. United States,* 19 Cl.Ct. 624, 631–32 (1990). Stated differently, it is more probable that the royalty-free "experiment" and "demonstration" clause contained in License I was meant to protect the government from having to pay for something that eventually proved to be a failure, or to allow the government to engage in genuine tests of Dow's invention.

Dow's invention was clearly not a failure, as the Rock Springs and Scranton projects proved. In fact, the government agreed to the compensation scheme contained in License II precisely because it knew Dow's invention was a success, and that Dow should receive reasonable compensation for extensive future use of Dow's invention. Moreover, the fact that these 21 projects were conducted through the competitive bidding process is evidence that the projects were not experiments undertaken for the purpose of determining whether the process worked. To the contrary, these projects were in keeping with the United States Bureau of Mines' policy to combat surface subsidence. Lastly, it is highly unlikely that the government undertook these 21 projects, at a cost of 45 million dollars, to merely demonstrate to the public "how it is done." After the Rock Springs and Scranton successes, the government produced and widely distributed a 30–minute film entitled "The Moving Earth" which demonstrated to the public "how it is done."

In the court's view the principle purpose of these projects was to save over 385 million dollars worth of homes, churches, businesses, and roads from falling into the earth, and not to "experiment" with, or "demonstrate," the technical and economical feasibility of Dow's invention. These 21 projects plainly constitute a pattern of systematic exploitation of Dow's invention to achieve the United States Bureau of Mines' public policy goal of subsidence control. Therefore, the court concludes that even if License I survived the execution of License II, the 21 projects listed above do not constitute royalty-free "experiments" or "demonstrations." Accordingly, the court denies defendant's motion for summary judgment, and grants plaintiff's cross-motion.

## CONCLUSION

For the reasons stated in this opinion the court finds the latest round of defenses raised by the government lack merit. Accordingly, Dow remains entitled to "reason-

result is that no valid and enforceable license currently exists. Therefore, any government use

of Dow's invention constitutes infringement.

able and entire compensation" from the government for patent infringement pursuant to 28 U.S.C. § 1498(a), but Dow's alternative theory of recovery based on 28 U.S.C. § 1491 must be dismissed. If the parties are unable to settle the damages question in light of this opinion, the court hereby schedules a trial on all remaining issues for the two weeks of November 28—December 9, 1994. Each side's case shall be limited to no more than five days. Cross examination of any witness shall be limited to one hour.

**IT IS SO ORDERED.**