**The DOW CHEMICAL COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 19–83C.**

United States Court of Federal Claims.

June 20, 1996.

Arthur M. Lieberman and Kevin S. Rhoades, Lieberman & Nowak, New York City, for plaintiff. Bernd Sandt and Bruce Kanuch, Midland, MI, The Dow Chemical Company, were of counsel.

B. Frederick Buchan, Washington, D.C., with whom was Vito J. DiPietro, Director, Commercial Litigation Branch, Civil Division, and Stuart E. Schiffer, Acting Assistant Attorney General, United States Department of Justice, for defendant.

## OPINION

SMITH, Chief Judge.

Plaintiff, The Dow Chemical Company (Dow), is seeking damages for patent infringement by the United States. This court held in favor of Dow on the issue of liability, *Dow Chemical Company v. United States*, 20 Cl.Ct. 623 (1990) (*Dow I* ), as well as finding the United States' license void *ab initio, Dow Chemical Company v. United States*, 32 Fed. Cl. 11 (1994) (*Dow II* ). This opinion disposes of the sole remaining issue: the calculation of a "reasonable rate of royalty" owed to Dow as the result of the government's infringement. The court finds that Dow is entitled to $17,325,000 prior to the inclusion of compound interest.

## FACTS

A complete description of the facts pertaining to Dow's invention and the instant case may be located in this court's previous opinions. *See Dow I*, 20 Cl.Ct. at 623; *Dow II*, 32 Fed.Cl. at 11.

The invention at issue is a pressurized slurry pump injection system developed to prevent surface subsidence, the primary cause of which is the collapse of abandoned subterranean coal mines and the subsequent deterioration of the overburden (the material between the mine void and the surface) due to the lack of support. The patent at issue has been of substantial benefit to persons who reside in locations where subsidence is likely to occur.

In 1970, Dow granted the government a provisional royalty-free license to use its invention for experimental and demonstrational purposes. The license was part of a larger contract in which the government employed Dow's invention at Rock Springs, Wyoming. In 1972, following the successful completion of the Rock Springs project, the government and Dow entered into a contract for a second project located in Scranton, Pennsylvania. The contract contained a new royalty-free license agreement under which the government was entitled to (1) use Dow's invention for government purposes on federal lands and (2) inject up to 2.5 million cubic yards of material for government purposes on non-federal lands. Subsequent to utilizing 2.5 million cubic yards, the government was required to pay a royalty rate not exceeding 25 percent of a "reasonable commercial rate." *See Dow II*, 32 Fed.Cl. at 26.

The patent in suit, hereinafter the '039 patent or the Dow patent, was issued to Dow on June 18, 1974. On July 9, 1975, Dow

requested an accounting from the government for royalties due under the Scranton license. The government refused to pay, claiming that the '039 patent was invalid and that no compensation was due because it had not practiced the invention. At Dow's request, the government reconsidered its position. By letter dated November 2, 1978, the government reiterated its belief that no recompense was merited and stated that three "seriously litigable" issues existed: (1) whether it was practicing the process protected by the Dow patent; (2) whether the Dow patent was valid; and (3) whether any license issued by Dow was viable.

Dow answered by filing for the reissue of its patent. Over government opposition, the Patent and Trademark Office affirmed the validity of Dow's patent as originally issued. On February 15, 1982, Dow repeated its request for royalties, and on December 20, 1982, the government responded that it was unwilling to change its position of November 2, 1978.

On January 17, 1983, Dow filed suit in this court against the government seeking a reasonable royalty for patent infringement or, in the alternative, damages for breach of contract. In response, the government argued that the '039 patent was invalid or, in the case of validity, that the government's activity was outside the scope of the '039 patent. On January 10, 1985, Dow notified the government that it was terminating the 1972 license for material breach because the government had refused to pay it any royalties. On June 8, 1990, after a six week trial, this court found the '039 patent valid and held the government liable for infringement. *Dow I,* 20 Cl.Ct. 623 (1990).

Following the court's decision in *Dow I,* the government challenged Dow's termination of the Scranton license in an attempt to take advantage of the favorable royalty rate (i.e., 25% of a reasonable commercial rate) for the purpose of ascertaining damages. Dow filed a motion for summary judgment arguing that it had justifiably terminated the Scranton license contract for material breach, and could treat the license as terminated *ab initio* by measuring damages as one hundred percent of a reasonable commercial rate. Defendant filed a cross motion for summary judgment claiming that Dow could not treat the contract as terminated, as well as raising a number of additional defenses to liability.

On November 8, 1992, this court orally granted Dow's motion and denied defendant's cross motion. The court held that defendant's failure to pay any royalties over the lengthy period of litigation, in addition to the parties' conduct in the lengthy litigation, as well as the policies underlying *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), lead the court to the conclusion that plaintiff acted properly by treating the license as void *ab initio. See Dow II,* 32 Fed.Cl. 11 (1994) and *Dow* Order of November 9, 1992.

The sole remaining issue in this case is the calculation of a reasonable royalty rate. Dow has petitioned for a royalty rate premised on the land value saved through use of its invention. The government, in contrast, asserts that a proper rate should be based on the amount of material injected at the various project sites. This opinion follows a second trial limited to the issue of damages.

## DISCUSSION

### I. LEGAL STANDARD

■ Under 28 U.S.C. § 1498(a),[1] the government may take a license to use a patented invention. *See Hughes Aircraft Co. v. United States,* 31 Fed.Cl. 481, 484 (1994), *aff'd,* 86 F.3d 1566 (Fed.Cir. 1996); *Decca Ltd. v. United States,* 640 F.2d 1156, 1166 (Ct.Cl. 1980), *cert. denied,* 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981); *Calhoun v. United States,* 453 F.2d 1385 (Ct.Cl.1972). Recovery of reasonable compensation under § 1498 is premised upon the government's power of eminent domain under the Fifth Amendment.

---

1. 28 U.S.C. § 1498(a) states: "Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture

the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture."

Courts have emphasized that when determining just compensation for any type of eminent domain action, including the unlicensed use of a patent, basic equitable principles of fairness must control. *See, e.g., Pitcairn v. United States,* 547 F.2d 1106, 1120 (Ct.Cl. 1976), *cert. denied,* 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978); *Tektronix, Inc. v. United States,* 552 F.2d 343 (Ct.Cl.1977), *modified on denial of reh'g,* 213 Ct.Cl. 307, 557 F.2d 265, *remanded to* 196 U.S.P.Q. 204, 1977 WL 22761 *aff'd in part, modified in part,* 216 Ct.Cl. 144, 575 F.2d 832 (1977), *cert. denied, Hickok Elec. Instrument Co. v. Tektronix, Inc.,* 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978).

Under § 1498, the government must pay the patent owner "reasonable and entire compensation" for the patent license taken. Section 1498, however, does not guide the court on the proper method to use when computing damages. The United States Court of Claims held that "reasonable and entire compensation" includes both a reasonable royalty for each infringement and compensation for the delay in payment of the royalties. *Pitcairn,* 547 F.2d at 1120.

■ Absent an established royalty rate, as in the instant case, the courts have employed the "willing-buyer"/"willing-seller" approach outlined in *Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), *modified,* 446 F.2d 295 (2d Cir.1971), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d. 114 (1971) (*Georgia–Pacific*) as a guideline to ascertain a reasonable royalty rate. *See, e.g., Tektronix,* 552 F.2d 343 (Ct.Cl.1977) and *Hughes Aircraft,* 31 Fed.Cl. 481 (1994). The royalty rate is calculated by constructing a hypothetical negotiation between two commercial entities negotiating at "arms-length" as of the date of the initial infringement. The *Georgia–Pacific* court listed the following fifteen factors as the key considerations in determining a royalty rate based upon a hypothetical negotiation:

(1) The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty;

(2) The rates paid by the licensee for the use of other patents comparable to the patent in suit;

(3) The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

(4) The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly;

(5) The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor or promotor;

(6) The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales;

(7) The duration of the patent and the term of the license;

(8) The established profitability of the product made under the patent; its commercial success; and its current popularity;

(9) The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results;

(10) The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention;

(11) The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use;

(12) The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

(13) The portion of the realizable profit that should be credited to the invention as

distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

(14) The opinion testimony of qualified experts;

(15) The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee-who desired, as a business proposition to obtain a license to manufacture and sell a particular article embodying the patented invention-would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia–Pacific*, 318 F.Supp. at 1120.

■ As noted by many courts, however, employing the willing licensee/willing licensor model for determining damages may risk the impression that flagrant appropriation of an invention is a "can't lose" situation for the infringer. If the patent holder sues the infringer, the worst result for the infringer would be the payment of a proper royalty as if the parties had negotiated in good faith. *See, e.g., Maxwell v. Baker, Inc.*, 86 F.3d 1098, 1109–10 (Fed.Cir.1996), *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed.Cir.1988), *remanded* 13 U.S.P.Q.2d 1856, 1989 WL 149268 (E.D.Mo., 1989), *aff'd* 909 F.2d 1495 (Fed.Cir.1990), *cert. denied*, 499 U.S. 907, 111 S.Ct. 1109, 113 L.Ed.2d 218 (1991). To rectify this situation, the court may consider additional factors necessary to assure the receipt by plaintiff of his *entire* compensation. *See, e.g., Maxwell v. Baker, Inc.*, 86 F.3d 1098, 1108–09 (Fed. Cir.1996) (vacating the trial court's decision and remanding the case, however, the court held as reasonable the jury verdict of $1.5 million as a royalty plus an additional $1.5 million to compensate for damages in excess of the royalty.)

■ Although the court constructs the hypothetical negotiations as of the date of the initial infringement, to ensure that plaintiff receives full compensation, the court also considers events which occurred and facts which were known after the initial infringement. *See Fromson*, 853 F.2d at 1575; *Hughes*, 31 Fed.Cl. at 484. Notwithstanding that such factors could not have been known by actual negotiators at the time of the infringement, these factors are necessary to approximate a "fair" royalty which knowledgeable business negotiators would have agreed upon if privy to all the relevant factors now before the court. *See Hughes*, 31 Fed.Cl. at 484–85. *See also Penda Corp. v. United States*, 29 Fed.Cl. 533 (1993); *ITT Corp. v. United States*, 17 Cl.Ct. 199 (1989).

■ The parties agree that no established royalty rate exists for the court to apply and that reasonable royalties are to be determined by hypothetical patent license negotiations between a willing licensor and willing licensee. Unfortunately, the agreement between the parties stops at this point. The methods suggested by the parties to compute the royalty rates and delay compensation are polar extremes of each other. To illustrate, defendant contends that reasonable royalties owed plaintiff range from $1.5 million to $2.43 million with total compensation between $2.43 million and $3.64 million when including delay damages. Plaintiff, however, believes that royalties total $43 million and that full compensation including delay compensation totals $168.24 million.

Plaintiff contends that a royalty based upon the value of property saved yields the appropriate award. Plaintiff claims that basing the royalty on the benefits conferred is often used when dealing with a process patent. Plaintiff also persuasively argues that when asking Congress for appropriations, the Department of the Interior specifically argued that the expense of the procedure was necessary to protect the land values and, therefore, compensation based on land value is the proper method.

Plaintiff focuses on *Georgia–Pacific* factors 8, 9, 10, and 11 to support its position for a royalty rate based on the benefit conferred. Plaintiff argues that the benefits that the government sought to achieve through its use of the '039 patent method include the

preservation of land, homes, and schools; the prevention of disrupting business, utilities, and the economic and social life of the affected communities; the preservation of the tax base of the federal and local governments; and, the preservation of the value of the affected property. Pl.Rep. at 2. Accordingly, plaintiff argues that the fairest method of determining a proper amount of compensation necessarily includes an assessment of those benefits amassed through the operation of its invention.

In contrast, the government asserts that the adoption of an inflation-adjusted sliding scale rate based on the amount of slurry injected affords a more reasonable basis for compensation. According to the government, reasonable negotiators in a hypothetical negotiation in 1974 would have agreed to rates based upon quantities injected. In addition to focusing on several *Georgia–Pacific* factors, specifically nos. 1, 2, 5, and 7 to 11, the government garners support for its position by incorporating plaintiff's own negotiations with the Pennsylvania Department of Environmental Resources (PADER) and the United States Department of the Interior (DOI) during which rates were offered and an allegedly comparable license on an analogous invention for filing mine voids existed.

After considering the arguments put forward by both parties, this court finds that the royalty rate should be based on the value of property saved. As discussed in greater detail *infra*, the court finds that an analysis of the relevant *Georgia–Pacific* factors demonstrates that a willing-buyer and willing-seller, having the knowledge possessed by the court, would have negotiated a royalty rate based on the value of property saved.

A. The Government's Effective Repudiation of the Contract Rendered it Void *Ab Initio*

Defendant argues that the parties relationship was that of "non-competitors and joint-developers" under *Georgia–Pacific* factor no. 5, and, therefore, the federal government should be permitted a significantly lower royalty rate, as the parties originally agreed to under the license agreement.

Under patent law, however, a breach by the licensee of the license agreement vests the licensor with the option of terminating the contract by treating the licensee's action as an offer to rescind and suing on the patent for infringement. *Dow II,* 32 Fed.Cl. at 17 (citing Ridsdale Ellis, Patent Assignments and Licenses §§ 779 & 782 (2d ed. 1943)). In the instant case, the government's expressed intention on November 2, 1978, not to compensate plaintiff constituted a repudiation of the contract. Plaintiff could lawfully treat as terminated its contract with the government because the government renounced its obligations under the license agreement and forfeited its rights contained therein. Subsequently, because the government's action abrogated the contract to the extent that it remained unperformed, and because the government had never performed under it, termination had an *ab initio* effect—that is, the termination rendered the license agreement void from the beginning, as if it had never existed. *Dow II,* 32 Fed.Cl. at 19.

Moreover, the court finds that *Georgia–Pacific* factor no. 15, the willing-buyer/willing-seller approach, is not exemplified by the actual licensing negotiations between DOI and plaintiff. First, the parties never agreed upon a "reasonable commercial rate" under the Scranton license. Second, because the license agreement is void *ab initio,* the unsuccessful negotiations pursuant to the void agreement shall not be considered by the court when determining a reasonable royalty rate. What rates or methodologies the parties used in their unsuccessful negotiations are immaterial to the court's determination of a reasonable rate based on the willing-buyer/willing-seller technique. *See e.g., Tektronix,* 552 F.2d at 349. (Whether parties agreed to a reasonable royalty rate is irrelevant.) That plaintiff may have considered a lesser royalty is not determinative. To impose this lesser rate on plaintiff would be to pretend that the infringement never occurred.

Regarding *Georgia–Pacific* factors nos. 1 and 7, defendant argues that this court must consider the settlement agreement between plaintiff and PADER as pro-

bative of a reasonable royalty rate based upon the amount of slurry injected. The court declines to consider the settlement agreement reached between PADER and plaintiff as indicative of an established royalty rate to be used in this case. A single agreement is not sufficient to find an established royalty rate. *See Trell v. Marlee Electronics Corp.,* 912 F.2d 1443, 1446 (Fed.Cir. 1990) ("A single licensing agreement, without more, is insufficient proof of an established royalty.") When determining the true measure of a reasonable royalty, the court must not select a diminished royalty rate that a patentee may have accepted in a settlement agreement. *See Fromson,* 853 F.2d 1568 (Fed.Cir.1988); Robert L. Harmon, *Patents & the Federal Circuit,* § 12.1(c) (3d ed. 1994).

Moreover, Rule 408 of the Federal Rules of Evidence was created specifically to exclude evidence of proposals made in contemplation of litigation in cases such as this. Because the royalty rate offers were made after the infringement had begun and because Pennsylvania was protected by sovereign immunity, the settlement terms cannot be considered evidence of an established royalty negotiated between a willing-buyer and willing-seller. *See Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1078–79 (Fed. Cir.1983).

This court must determine a reasonable royalty rate based upon a hypothetical negotiation using evidence in light of the factors identified in *Georgia–Pacific.* The court agrees with plaintiff that *Georgia–Pacific* factors 8, 9, 10, and 11 are highly probative for determining the reasonable rate. The hypothetical negotiation is a tool, a legal fiction, designed by courts to compensate the patent owner for infringement. The negotiation does not include void agreements, settlement agreements or other evidence not relevant to value.

### B. Plaintiff's Patent is an Extraordinary Invention which Warrants an Increased Rate of Compensation

Factor no. 9 of the *Georgia–Pacific* decision concerns "the utility and advantages of the patent property over the old modes or devices" while factor no. 11 concerns "the extent to which the infringer has made use of the invention." Both factors were demonstrated by the utility of plaintiff's invention in preventing further subsidence in the Scranton locality as used by the government.

The benefits of plaintiff's invention, *as stressed by the government when seeking funding for the projects,* were listed in the United States Bureau of Mines Information Circular 8665 (1975). The benefits of plaintiff's invention are significant, especially when compared to other methods of subsidence control. As quoted by this court in *Dow I,* the benefits over other methods of subsidence control include:

(1) Great reduction in the number of injection boreholes. A single injection hole serves the purpose of many injection holes in the gravity-feed method.

(2) More complete vertical filling of mine openings.

(3) More complete area coverage. Areas inaccessible because of surface improvements can be filled.

(4) Less disruption of the community in the form of noise, dust, and traffic interference by drilling operations and trucking of fill material.

*Dow I,* 20 Cl.Ct. at 626.

As discussed in this section, the advantages of the patent at issue are stressed further by *government* admissions which stated that in many urban areas, plaintiff's invention was the only feasible method available for preventing subsidence. As indicated in *Dow I,* prior to the '039 patent, subsidence control took one of two forms. In the more effective form, known as controlled flushing, workers entered mine voids and constructed bulkheads around the portion of the mine where added support was necessary. Pipelines were then set up through existing holes in the bulkhead or other areas of the mine and a slurry of water and solid material was piped in until the mine void was filled. However, due to hazardous conditions such as water inundation, the number of mines which could be entered safely was limited. As a

result, blind flushing[2] became the more frequently used method. Yet, the large number of boreholes needed and the relatively small amount of support material which could be deposited into each borehole also resulted in limiting the use of this method. *Dow I,* 20 Cl.Ct. at 625.

Plaintiff developed the '039 patent method and alleviated many of the difficulties which existed when using prior methods. Based on (i) this court's previous opinion in *Dow I,* (ii) the trial testimony, and (iii) government documents, the '039 patent may be classified as a breakthrough invention which produced exceptional results. Thus, plaintiff's invention merits an increased rate of compensation. While the government's expert stated correctly that plaintiff's invention is not the laser or the transistor or the discovery of recombinant DNA, it is a significant breakthrough in its field.

The court does not accept defendant's assertion that because other alternatives existed besides plaintiff's invention, plaintiff should not receive an increased rate of compensation. A method lacking the advantages of the patented invention can hardly be considered a suitable substitute if the infringer sought those specific advantages found in the patent. Robert L. Harmon, *Patents & the Federal Circuit,* § 12.1(c) (3d ed. 1994).

In *Dow I,* this court stated that:

It appears from the testing and evidence that the prior art was only barely adequate to perform backfilling tasks. The current innovation is the first system to draw rave reviews in the industry, and appears to perform significantly better than prior art systems.

*Dow I,* 20 Cl.Ct. at 637.

On the originality of the patent, the court stated:

The equipment used, and all parts necessary, are commercially available. It is the combination of these previously known and used items and systems which distinguishes the '039 patent from the prior art. *Id.*

Besides the obvious advantages of plaintiff's invention, *Georgia–Pacific* factor no. 9, the court finds very probative the extent to which the government employed the invention, *Georgia–Pacific* factor no. 11. At trial, although the government's witness, Robert Tittle, an employee of the Office of Surface Mines, testified as to the existence of two alternative methods of subsidence control, both methods may be distinguished from plaintiff's patent as variations on blind flushing. More important, however, was Tittle's admission that in more than *ninety* percent of the twenty-five projects at issue in the damages phase of the instant case, plaintiff's patent was selected over blind flushing. Based on this statistic, it is evident that the government recognized the originality of the '039 patent and the inherent advantages that it gave over alleged alternatives. The reason the government used plaintiff's patented method was that it needed the invention to produce the desired results.

Admissions by a number of government entities concerning various projects also support this court's finding that the '039 patent should not be compared with previously used alternatives. The Bureau of Mines stated in its Environmental Statement for the projects at issue in the instant case that:

[W]e believe that no other method of backfilling would provide the degree of support necessary to prevent recurring earth settling and its attendant surface damage in the City of Scranton.

Negative Environmental Statement Declaration, Pittston–Hickory, June 10, 1977 and Negative Environmental Statement Declaration, Borough of Dunmore, Lackawanna County, Pennsylvania April 14, 1977. In addition, in a Memorandum on the Minooka project, the government concluded that "controlled flushing and gravity-blind flushing methods would not be feasible nor effective in providing the support that is needed." Finally, in 1972, the Bureau of Mines Director testified that "there is just no other

---

2. In blind flushing, boreholes are drilled from the surface into mine voids and a slurry of water

and solid material is then piped or flushed down these boreholes.

practical way that we know of" to alleviate the subsidence problem in the aforementioned urban areas.[3]

Regarding *Georgia–Pacific* factor nos. 9 and 11, this court finds that the slurry pump may be categorized as a breakthrough process of extraordinary application which the government used extensively over blind flushing. Thus, a premium damage award premised on the value of land saved by the patent is clearly warranted, rather than a rate based on the amount of material injected—as used in more ordinary patents.

C. The Benefits of Plaintiff's Invention are Substantial

*Georgia–Pacific* factor no. 10 concerns "the nature of the patented invention, . . . and the benefits to those who have used the invention" while factor no. 8 concerns "its (the patent's) commercial success and its current popularity." Plaintiff's invention obviously yielded a large number of benefits beyond what prior methods could produce and was chosen consistently over other methods of subsidence control. The amount of royalty, therefore, owed to plaintiff should be comparable to these benefits.

Basing plaintiff's royalty upon the benefit of the invention, or the property value saved, is analogous to basing a royalty upon the cost savings recovered from implementing a more efficient invention. As stated by the Federal Circuit, "[r]eliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty." *Hanson*, 718 F.2d at 1080–81 (citations omitted). Determining the royalty by the benefit conferred, similar to the cost savings received, is proper when the benefits from the invention are so obviously significant, as in this case.

The substantial benefits of plaintiff's invention, *Georgia–Pacific* factor no. 10, and its popularity, *Georgia–Pacific* factor no. 8, were

made obvious to this court by defendant's own admissions. Each Negative Environmental Statement Declaration prepared by the Bureau of Mines reiterates the same theme—that plaintiff's invention may have saved the City of Scranton and the surrounding communities from becoming ghost towns. The Green Ridge II draft Environmental Statement testified to the fact that the if subsidence occurred "homes would be damaged and possibly rendered unsafe for habitation and on-site and adjoining property values would drop drastically."[4] The Negative Environmental Statement Declaration regarding Archbald Borough, Lackawanna County stated that "[f]ailure to alleviate the effects of subsidence in the area would probably cause businesses to leave Archbald, as subsidence has already caused conditions adverse to public health and safety and has had a severe depreciating effect on property values." The Bureau of Mines reached the same conclusion with regards to the boroughs of Jermyn, Jessup, Moosic, and Dunmore, and the City of Scranton.

The benefits of plaintiff's invention certainly were stressed by the government when it recommended plaintiff's process. Recognizing the possible economic effects and decrease in property values that subsidence might cause, the government, in its "Cooperative Agreements" with municipal governments in 1977, described its purpose regarding subsidence control projects as:

[A]n opportunity to minimize or eliminate entirely the subsidence hazard and enhance the value of the public and private property in the project area.[5]

Regarding property damage caused by subsidence, the government stated that:

The appearance of structural damage to one's home presents serious problems both emotional and economic. . . . In neighborhoods where one or more houses have been damaged, value of other property

3. Testimony before the House Subcommittee on the Department of Interior and Related Agencies Appropriations, February 28, 1972, p. 595.

4. Draft Environmental Statement, U.S. Department of Interior (1972), pp. 12–13.

5. Cooperative Agreement Between United States and City of Scranton, May 25, 1977.

declines.[6]

The context of this and similar admissions, coupled with the beneficial effects gleaned from the '039 patent, led this court in *Dow II* to state that:

> [T]he principal purpose of [the subsidence control] projects was to save over 385 million dollars worth of homes, churches, businesses and roads from falling into the earth.

*Dow II*, 32 Fed.Cl. at 28. It therefore appears that the government's goal was to preserve and increase the value of property by utilizing the '039 patent to directly alleviate subsidence difficulties. The considerable benefit of plaintiff's invention to numerous communities, states, families, and businesses clearly warrants a royalty based on the land value saved.

## II. SPECIFIC CALCULATIONS [7]

To calculate the specific amount of damages for an award premised on the value of property saved, plaintiff presents a two step process. The first step is to determine the decrease in land value that would have resulted had the '039 patent not been used by the government. The second step is to incorporate in the royalty rate a percentage of the benefits conferred. Plaintiff argues for 33 percent of the benefit conferred by the use of the invention based upon a 40 percent decrease of the land value. Using plaintiff's percentages yields a total benefit of $43 million prior to the inclusion of delay compensation.

Defendant vehemently argues against a royalty premised on the potential decrease of the land values if subsidence occurred. The government asserts that plaintiff provided "no credible evidence" that property values (1) changed because of treatment with the '039 invention or (2) decreased because of the potential for subsidence. Furthermore, the government disputes that 40 percent of the total value was "saved" or that plaintiff's invention benefited the property by that amount. The government also claims that

the entire value based approach assesses an unreasonable and exorbitant royalty which yields erratic results.

As the court addressed in the previous section, a value-based royalty, similar to a cost savings royalty, is not an unusual or unreasonable method to calculate royalties. This is especially true in scenarios such as presented in this case where lost profits would be impossible to ascertain. *See Hanson*, 718 F.2d at 1081 (citations omitted). Furthermore, contrary to defendant's assertion, to be considered "reasonable," a royalty rate based upon a hypothetical negotiation need not be proportional to the cost of an invention. In *Hanson*, the Federal Circuit upheld the royalty rate selected by the Magistrate to be reasonable although the rate amounted to 18% of the purchase price of a machine using the invention and that over the remaining life of the patent, the total royalties required to be paid would exceed the cost of purchasing the non-infringing machine. The Federal Circuit stated:

> The reasonableness of the royalty does not depend upon or have any relationship to the cost of a machine ... it (the defendant) cannot invalidate an otherwise reasonable royalty on the claim that by hindsight it would have been better off if it had purchased the non-infringing ... machines.

*Hanson*, 718 F.2d at 1081.

The court believes that plaintiff's suggested method is sound but that plaintiff's percentages are too high and do not accurately reflect the evidence presented. First, plaintiff's evidence was not consistent regarding the percentage of total value saved. In reference to the 40 percent figure, plaintiff stated: "[I]t's anywhere from 10 to 80 percent ... He [our expert] selected 40. We're not suggesting that its fixed in steel ... [I]ndeed, you can do something else with this ... [I]f you wanted to, you could come up with another locus for 20 percent of the savings." Second, one may not conclude that a decrease in land value would have resulted wholly from subsidence. Other related factors, including environmental conditions and

---

6. Allen, "Recent Developments in the Use of Mine Waste for Subsidence Control," p. 20.

7. *See* appendix for the mathematical computations. *See also* footnote 8 for explanations of the numbers and formulas used.

the changing economy of these areas also may impact these land values.

The court finds that 25 percent, rather than 40 percent, constitutes a more reasonable percentage of the total value saved. The court finds probative the government's admissions regarding the Rock Creek, Wyoming property. The evidence showed that for properties directly affected by severe subsidence the loss in property value averaged 44 percent. In reality this means that a number of properties that suffered severe subsidence experienced more extreme declines, many, where the house or building became unsafe, declined by 100 percent, since they would be completely unusable. The evidence also showed that while a house that had severe damage would suffer an extreme decline in value, the undamaged house next door would suffer a significant decline in value because of the potential danger. The house next door to that one would also suffer, but slightly less of a decline, and so on as one went farther from the specific subsidence. This grid pattern affected the whole area threatened by the decline, in the government's view, between 10 and 20 percent of the area's total property value. Thus, a twenty-five percent average for the property value saved over the whole region is quite conservative, based upon the government's own figures. The evidence at the first trial and in this one showed overwhelmingly that this scenario was not hypothetical but reflected the real value saved because of the plaintiff's invention.

Concerning the second step—the portion of benefits conferred—Dow requested one-third, or 33 percent. Instead, based on the testimony of plaintiff's very credible witness, Julie Davis, this court determines that 15 percent is more appropriate. Although Ms. Davis employed 15 percent in the context of project cost, not land value saved, it is appropriate here as well for two reasons. First, Ms. Davis stated that 15 percent is the highest rate that she has seen prescribed for a pioneer patent which allowed the users to do that which could not be done previously.

Because Ms. Davis was applying a rate used for a pioneer invention, similar to the patent at issue, it logically follows that a similar rate should be used for the '039 invention as it too "allows others to do that which could not be done previously." Second, after a careful weighing of the factors involved, it is this court's opinion that justice will be best served by using 15 percent to compute the portion of benefits conferred awardable to plaintiff. Based on Ms. Davis' testimony, the factual background, and the aforementioned advantages and benefits of the '039 patent, this court concludes that 15 percent is a reasonable percentage with which to compensate plaintiff.

Plaintiff valued the land at approximately $462 million as of the time the invention was implemented while defendant valued the land at $385 million. Plaintiff's valuation expert, Mr. Peter Kanton, testified at length regarding how he valued the land in each project. Mr. Kanton testified that he spent over two hundred hours appraising the property at issue. Mr. Kanton testified in great detail regarding the employed appraisal methods, the different valuation techniques, and how he obtained the figures necessary to estimate the property value of each project.

The court found Mr. Kanton to be a highly credible witness and accepts his valuation of the property at $462 million. Mr. Kanton has lived in the Scranton area all of his life, his whole career has focused upon the local real estate and appraisal industry, and he has owned his own real estate and appraisal business in Scranton since 1981. The court found that Mr. Kanton did a professional job determining the valuation of the property at issue.

The court finds that the property in the areas where the invention was practiced is properly valued at $462 million. The court finds that the property value would have depreciated by 25 percent if subsistence had occurred and that a reasonable royalty rate would be 15 percent of the benefit conferred.[8] Plaintiff's royalty, before delay compensation, totals $17,325,000.

---

8. *See* appendix for calculations of the property value saved by the '039 patent. Column A is the project name; column B is the value of the property as of the project date; column C is the portion of value saved by the use of the '039

## III. DELAY COMPENSATION

As part of plaintiff's "reasonable and entire compensation" under 28 U.S.C. § 1498, both parties agree that plaintiff is entitled to delay compensation. Delay compensation is the amount of interest due for loss of royalty use which plaintiff would have enjoyed had payment of such royalties been timely. The parties disagree, however, as to (1) which interest rates should apply in computing delay compensation and (2) whether payment of income taxes should be taken into account.

### A. A Uniform Rate Should be Applied to Calculate Delay Compensation

 The government argues that plaintiff should be paid delay compensation at the "risk free" three-month treasury bill ("T-bill") rate. According to the government, plaintiff did not bear and thus should not be compensated for the risk of future interest rate changes by using higher rates of interest. Instead, argues defendant, T-bill rates are the appropriate interest rate because they are commensurate with the absence of any risk taken by a party. Therefore, defendant contends, the uniform rates used in *Hughes,* 31 Fed.Cl. 481 (1994), and similar cases should not be applied in the instant case because they are not risk-free, are not available to investors in the market, and do not reflect or correspond to the time value of money. The government further asserts that the interest from delay compensation should be simple rather than compound interest.

The court rejects the government's argument and agrees with plaintiff that delay compensation should be calculated using a uniform rate rather than a three month T-bill rate. *See, e.g., Miller v. United States,* 223 Ct.Cl. 352, 402, 620 F.2d 812 (1980) ("There is ... strong judicial policy in favor of the establishment of a uniform rate of interest applicable to condemnation cases in order to avoid discrimination among litigants.") In *Miller,* this court adopted annual rates, 7.5% for the period 1973 through 1975 and 8.5% for the period 1976 through 1979 (and during the month of January 1980), for use in the calculation of delay compensation. For dam-

ages accruing on or after February 1, 1980, the tax overpayment rates prescribed by 26 U.S.C. § 6621, and approved of in *Hughes,* should be applied.

> [T]he current statutory overpayment rate [is] a fair, easily ascertained, commercially reasonable, objective measure of delay damages automatically adjusted from time to time to take account of changing rates and conditions in the marketplace.

*Hughes,* 31 Fed.Cl. at 494.

Analogous to *Miller,* the court stated in *Hughes* that an "objective method of fixing delay damages when the government has been found liable for past due royalty payments is sorely needed." 31 Fed.Cl. at 494. Further, the court held that "it is too burdensome to require parties to make specific proof in every case as to the appropriate interest rate.... It will further the goal of equal justice, reduce the costs and complexity of litigation, and facilitate decision (as well as settlement) to accept and establish ... [uniform rates]." *Id.* at 494 (quoting *Tektronix,* 552 F.2d at 353.) It might be noted that this rate still under-compensates the average profit-making business. This is so because if the best return a business can get on its own capital is the CD rate or something analogous, the business should sell out, put the money in a bank or secure bonds and collect its interest rather than engage in the effort of producing and selling a product or service with all the inherent risks that entrepreneurship entails. The sad saga of this case illustrates the realty and severity of these risks.

 Addressing whether delay compensation should be compounded, *Whitney Benefits, Inc. v. United States,* 30 Fed.Cl. 411 (1994) provides significant guidance. In *Whitney Benefits,* a taking case in which the government took plaintiff's land under the Surface Mining Control and Reclamation Act (SMCRA), this court delineated the contrast between the effects of simple and compound interest on the party to whom compensation is due. The court held that:

> Where the government has taken plaintiff's property and returns a payment worth an identical amount at a subsequent

patent (25 percent of column B); column D is the royalty amount (15 percent of column C).

date, the plaintiff still suffers an economic loss. Such a conclusion follows from the fact that when the government merely returns an identical sum as compensation, the plaintiff loses the opportunity to earn interest on its principal. . . . Thus, to be made whole for the taking of their property, the plaintiff must be compensated for the time value of their property and the inflation rate. The market does this through compound interest.

*Id.* at 413; *see also Bowles v. United States*, 31 Fed.Cl. 37, 53 (1994). In addition, as the court stated in *Hughes:*

We are absolutely persuaded that simple interest with respect to any time period relevant in this case would not be commercially reasonable and would not place the plaintiff in as good a position pecuniarily as . . . [it] would have occupied if the payment had coincided with each taking of a patent license.

*Hughes,* 31 Fed.Cl. at 493 (quoting *Kirby Forest Indust. v. United States,* 467 U.S. 1, 10, 104 S.Ct. 2187, 2194, 81 L.Ed.2d 1 (1984)).

Based on the reasoning in *Whitney Benefits* and *Hughes,* the court concludes that the mere repayment of principal will fail to adequately compensate plaintiff because the returned principal, due to both inflation and the time value of money, will have less buying power than if defendant had paid a royalty fee at the time defendant used the patent. Furthermore, a compounded rate of interest shall be applied in the final calculation of a royalty award to assure that plaintiff will be put in as good a financial position as before the infringement; at least as it is within the powers of the law to award.

### B. Delay Compensation Should Not Account for Taxes

 The government argues for a reduction of the interest award for each year by the presumed amount of federal income tax which would have been due by plaintiff. Defendant contends that a delay compensation method which incorporates taxes would account for payment of taxes at an appropriate rate, avoid double taxation, and avoid the enormous IRA-type windfall that plaintiff would reap if the tax effects were ignored.

This court, however, has rejected assertions that a plaintiff's recovery be lowered in accordance with the tax effect, and instead has held that pre-tax loss represents the proper damage done. *See, e.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 503, 88 S.Ct. 2224, 2236–37, 20 L.Ed.2d 1231 (1968); *Hughes,* 31 Fed.Cl. at 494; *ITT,* 17 Cl.Ct. at 242–243. In *Hughes,* the court clearly and coherently summarized the reasons for declining to reduce plaintiff's award based on taxation:

We decline to adopt defendant's approach for four reasons: First, case law rejects this approach. Second, a fair application of defendant's theory would require findings concerning a plaintiff's actual tax situation for each applicable year (more than 20 in this case) [9] and speculation concerning actions which a reasonable recipient might have taken to reduce taxation on awards if received when due, e.g., timing of charitable giving, carryforwards and carrybacks, anticipation of losses.

Third, defendant's hypothetical taxation method would result in the same kind of discrimination among just compensation claimants that non-uniform rates of interest would cause. A plaintiff with chronic heavy losses or who resides or does business in a state with high state income taxes (deductible for federal income tax calculations) would receive more delay damages for a given period than an otherwise similarly situated plaintiff with chronic healthy profits or residence in a state with low taxes. Similarly, a foreign patentee not subject to United States income taxation would be treated more favorably than a domestic patentee.

Finally, Congress is undoubtedly aware of the beneficial effect of a compound interest award which presumes reinvestment of the full amount of interest earned at the end of each compounding period without reduction for taxes. Even so, although 26 U.S.C. § 6622 awards against the Government in a variety of situations, Congress has not chosen to require any reduction of

---

**9.** "This case" refers to *Hughes Aircraft Co. v.* *United States.*

interest in the manner suggested by defendant.

*Hughes,* 31 Fed.Cl. at 494–495.

The government's argument has been made previously and has enjoyed little success. In addition, the government's position would create a very burdensome administrative process, is inconsistent with the reality that plaintiff is receiving this income now and will pay taxes on it now, and is less logical than the *Hughes* court's clear and logical method. Since neither statute, precedent, or logical argument support the government's theory, the court adopts the method proposed by the plaintiff and shall award pre-tax compound interest.

### CONCLUSION

The court finds that the evidence strongly supports plaintiff's claim that this invention was a major breakthrough in the area of subsidence control and thus is entitled under the test set out in Georgia–Pacific to a royalty rate based on a percentage of the benefit conferred on the government. Accordingly, Dow is entitled to $17,325,000 as a reasonable royalty prior to the calculation of interest compounded annually.

In accordance with this opinion, the parties are directed to submit either a joint calculation of interest owed or individual calculations if a joint calculation cannot be agreed to after diligent efforts. This shall be done within sixty days of issuance of this opinion.

The court shall hold a status conference on Thursday, June 20, 1996, at 12:30 p.m. EDT to discuss any issues relevant to this opinion.

IT IS SO ORDERED.

### Appendix

| | A | B | C | D |
|---|---|---|---|---|
| Year | Project Name | Total Value as of Project Date | Portion of Total Value Saved [25% ] | Royalty 15% |
| 1974 1974 | Green Ridge II | 15,235,000 | 3,808,750 | 571,313 |
| 1974 1974 | Minooka | 9,080,100 | 2,270,025 | 340,504 |
| 1974 1975 | Eddy Creek | Unknown | 0 | 0 |
| 1975 1975 | Olyphant | 12,359,000 | 3,089,750 | 463,463 |
| 1975 1976 | Taylor Borough | 3,900,000 | 975,000 | 146,250 |
| 1974–76 1976 | Rock Springs III and IV | 17,000,000 | 4,250,000 | 637,500 |
| 1975 1977 | Dickson City | 1,804,400 | 451,100 | 67,665 |
| 1977 1977 | Moosic | 3,651,400 | 912,850 | 136,928 |
| 1977 1978 | Jessup | 19,312,535 | 4,828,134 | 724,220 |
| 1977 1979 | Pear Street | 23,145,000 | 5,786,250 | 867,938 |
| 1977 1979 | Archbald | 6,317,975 | 1,579,494 | 236,924 |
| 1979 1979 | Jermyn | 11,539,437 | 2,884,859 | 432,729 |
| 1978 1980 | Dunmore/Throop | 14,550,100 | 3,637,525 | 545,629 |
| 1978 1980 | Tripp Park I | 7,853,600 | 1,963,400 | 294,510 |
| 1979 1980 | Tripp Park II | 6,778,575 | 1,694,644 | 254,197 |
| 1978 1980 | Minooka/Cedar East | 17,573,000 | 4,393,250 | 658,988 |
| 1975 1980 | Pittson Ave. & Hickory Street | 23,981,600 | 5,995,400 | 899,310 |
| 1978 1980 | North Main Ave. | 60,608,000 | 15,152,000 | 2,272,800 |
| 1982 1983 | Wilkes–Barre Scranton Airport | 100,000,000 | 25,000,000 | 3,750,000 |
| 1980 1983 | Old Forge Taylor | 39,497,900 | 9,874,475 | 1,481,171 |
| 1982 1984 | Albright Avenue | 13,104,372 | 3,276,093 | 491,414 |
| 1978 1984 | South Sixth Ave. I | 25,073,300 | 6,268,325 | 940,249 |
| 1983 1986 | Philo Street | 30,171,400 | 7,542,850 | 1,131,428 |

TOTAL 17,345,126