Bisrat **MEKURIA**, et al., Plaintiffs,

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,** Defendant.

**Civil Action No. 96–866(GK).**

United States District Court, District of Columbia.

March 16, 1999.

David A. Super, Jerome T. Tao, Ronald B. Vergnolle, James F.H. Scott, Baker & Botts, Washington, DC, Wendy Kay Luersen Harvel, Willms, Smith & Reynolds, LLP, Austin, TX, for plaintiffs.

Bruce P. Heppen, William A. Caldwell, Sonia A. Bacchus, Washington Metro. Area Transit Auth., Office of General Counsel, Washington, DC, Keith Michael Bonner, Gilberg & Kiernan, Washington, DC, for defendant.

## MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs, owners and operators of neighborhood businesses in the Petworth area of the District of Columbia, are asserting a claim of inverse condemnation against Defendant Washington Metropolitan Area Transit Authority ("WMATA"). They claim that Defendant, in the course of constructing the Georgia Avenue/Petworth Metrorail Station, has taken their property without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution. This matter now comes before the Court for final decision after a five day bench trial. Having considered the testimony of all witnesses, the numerous exhibits submitted by both parties, the closing briefs, and the applicable case law, the Court issues the following Findings of Fact and Conclusions of Law.

## I. Findings of Fact

### A. The Parties

1. The Plaintiffs, Bisrat Mekuria, Francis Fabrizio, Jr., Carlton Hugh Henry, George Beckford, America's Cash Express Inc. ("ACE"), Tewidros Estafanos, and Ghirmai Ghebremichel, are the owners or lessees of property located along New Hampshire and Georgia Avenues in the Petworth area of the District of Columbia. All Plaintiffs, other than Francis Fabrizio

(who owns and rents out his properties), formerly operated or currently operate small neighborhood businesses on their properties.

2. Defendant WMATA is an agency and instrumentality of the District of Columbia, Maryland, and Virginia, authorized by a Congressionally approved compact amongst these three entities to plan, develop, finance, and operate a regional transportation system.

### B. The Metrorail Station and Construction Site

3. On or about June 20, 1994, WMATA began construction of a new Green Line Metrorail station located in the vicinity of Georgia Avenue, N.W. and New Hampshire Avenue, N.W. between Park Road, N.W. and Randolph Road, N.W. in the District of Columbia.[1] Both Georgia Avenue and New Hampshire Avenue are major thoroughfares running through the Petworth section of Washington. The construction site for the new station ("Construction Site") occupies the entire width of the 3700 block of New Hampshire Avenue, from south of Rock Creek Church Road to Randolph Street, and the 3600 and 3700 blocks of Georgia Avenue. When Georgia Avenue was closed in March 1995, WMATA constructed a semi-circular detour around the Construction Site (the Georgia Avenue Detour). This Detour was the closest open street to the west of the 3700 block of New Hampshire Avenue. The length of the Site was approximately 1120 feet or the equivalent of at least three city blocks.

Plaintiffs' Exhibit 1, reproduced as an Appendix hereto, shows the area under construction as well as the Georgia Avenue Detour.

4. During the week of October 1, 1994, New Hampshire Avenue, between Georgia

[1]. All street references refer to addresses in Northwest Washington, D.C., unless otherwise noted.

Avenue and Randolph Street, and specifically the 3700 block of New Hampshire Avenue, was closed to all vehicles because of construction. New Hampshire Avenue was not reopened for more than three years until December 21, 1997. Thus, once construction commenced, there was no direct vehicular access to those of Plaintiffs' properties which fronted on New Hampshire Avenue. During that same three year time frame, vehicle access to Rock Creek Church Road from New Hampshire Avenue was also closed. Prior to commencement of the construction, Rock Creek Church Road headed one way northeast across Georgia and New Hampshire Avenues, and provided reasonable access to those of Plaintiffs' properties which fronted on it. Once the construction began, Rock Creek Church Road came to a dead end about sixty feet east of the intersection of Georgia and New Hampshire Avenues.

5. In March 1995, Georgia Avenue, from Quebec Place on the south to Quincy Street on the north, and specifically the 3600 block of Georgia, was closed to all vehicles because of construction. The Georgia Avenue Detour was constructed around the Construction Site, and WMATA placed barriers in front of Plaintiffs' properties which fronted on the 3600 block of Georgia Avenue. As a result of the closure of Georgia Avenue, there was no direct street access to Plaintiffs' properties fronting on the 3600 block of Georgia Avenue. Georgia Avenue was not reopened until August 21, 1997, when three lanes were made accessible to traffic. The fourth lane is still being worked on, and Georgia Avenue has not yet been restored to full accessibility. Thus, because of the presence of the Detour and barriers on Georgia Avenue, there was no direct vehicular access to Plaintiffs' properties in the 3600 block of Georgia Avenue.

6. The Metrorail Construction Site—a huge excavation—on New Hampshire was the width of the street, approximately 920 feet. A nine-to eleven foot chain link fence, topped with barbed wire, surrounded the entire Construction Site, including both the area of excavation itself and other additional areas used for construction equipment and related facilities. The fence ran within one foot of the sidewalk in front of Plaintiffs' properties.

7. Prior to construction, there were extensive discussions between WMATA personnel and District of Columbia government personnel about numerous matters relating to construction of the Petworth station. There was substantial community opposition to WMATA's original plans which would have cut a wide swath through homes and businesses. Ultimately, WMATA agreed to use a particular method of construction which would save the taking/condemnation of 97 homes.

8. Under the Fifth Interim Capital Contributions Agreement, entered into by the various jurisdictions which fund WMATA, the parties, including the District of Columbia, agreed that "the District will close New Hampshire Avenue entirely between Georgia Avenue and Quincy Street, N.W. to provide construction work site area. Utilizing the public space will allow homes in the 3700 block of New Hampshire to be spared from takings. *Access to the properties in the 3700 block of New Hampshire must be maintained.*" (emphasis added).

9. WMATA did formally condemn seven businesses, six on the west side of Georgia Avenue and one on the east side. The owners of these properties received compensation for their fair market value as well as relocation costs. None of Plaintiffs' properties were condemned. At no time were Plaintiffs given the option of having their properties acquired by WMATA. WMATA represented to the public, including Plaintiffs, that there would be reasonable vehicular, pedestrian, and vendor access for deliveries to Plaintiffs' properties, and that such access would include reasonable parking.

10. Prior to commencing construction, WMATA prepared a Composite Traffic Control Plan for areas adjacent to the Construction Site. Under WMATA's Plan, Plaintiffs' properties could only be accessed by car from the rear, using a route consisting of streets to the east of New Hampshire Avenue. The planned rear access route ended in what WMATA described as a "turn-around" on Rock Creek Church Road, approximately 60 feet from the intersection of New Hampshire Avenue and Rock Creek Church Road. Because Rock Creek Church Road is a very narrow street, the Plan recognized that closing the intersection of Georgia Avenue and Rock Creek Church Road was essential.

11. Despite WMATA's Plan to use Rock Creek Church Road as a "turn-around" for delivery trucks, during the entire period of construction it was illegal to park or stop on the so-called "turn-around" on Rock Creek Church Road.

12. WMATA also represented to the public, including Plaintiffs, prior to construction, that the "turn-around" would be 50 feet wide, allowing use by a standard-sized delivery truck. As constructed, according to WMATA's own measurements, the "turn-around" on Rock Creek Church Road was only 42 feet wide, at most.

13. During the period of construction, WMATA made no effort to determine whether the "turn-around" on Rock Creek Church Road provided adequate access for making deliveries to Plaintiffs' properties. In fact, it did not provide adequate access, and Plaintiffs were unable to receive deliveries which were essential to the maintenance of their businesses.

14. WMATA's Traffic Plan envisioned that a driver utilizing the alleged rear access route to Plaintiffs' properties to Rock Creek Church Road would (1) start on 7th Street and turn left onto Quincy Street (where a sign read "Street Closed to Through Traffic"); (2) proceed west for a full block on Quincy Street to the dead end at New Hampshire Avenue; (3) turn south on 8th Street and proceed for a full block to the intersection of 8th Street and Rock Creek Church Road (where there was a "Detour" sign pointing east, back to 7th Street); and then (4) go in the opposite direction from the Detour sign, proceed west on Rock Creek Church Road to the "turn around" where a "No Stopping" sign was posted and it was illegal to stop or park. Even though WMATA had placed a sign on Seventh Street saying businesses were open, there was no listing of which businesses in the area were still open.

15. Despite the difficulties of negotiating this rear access route, there were no signs posted during the period of construction that explained the directional pattern or even the existence of this route, nor were there any signs posted indicating the presence of the "turn-around" on Rock Creek Church Road or how to negotiate the turns and twists to get to it. As a WMATA witness phrased it, "you had to know about it [the access route to Plaintiffs' stores] or stumble on it".

16. Plaintiffs complained to WMATA about the lack of pedestrian and vehicular access to their properties, but WMATA took no actions to rectify or ameliorate the situation. Mr. Mekuria, in particular, filed 20–30 complaints with WMATA about the problems he was having with lack of access to his properties.

17. During the period of construction, pedestrian access to Plaintiffs' properties, while not totally foreclosed, was limited to a circuitous, uneven pedestrian sidewalk with holes, depressions, and chunks of broken concrete. The sidewalk was fifteen feet at its widest but only about three feet at its narrowest, with an average width of between six and nine feet.

C. **Plaintiffs' properties and businesses**

18. Plaintiff Bisrat Mekuria, and his wife, own Lot 806, Square 3030, which includes three separate properties: (1) a retail space located at 3713 New Hamp-

shire Avenue, in which Mr. Mekuria operates a convenience grocery store called Family Food Markets; (2) a second-floor rental apartment above the store, with a first-floor entry, at 3713 New Hampshire Avenue; and (3) a separate rental retail space which fronts on and has access to Rock Creek Church Road. Each of the properties has its own utilities and a separate mailing address.

19. Mr. Mekuria operated his convenience grocery store at 3713 New Hampshire Avenue until he was forced by the impairment of access caused by the Construction Site to close it in October 1995. There are no doors or passageways between the two properties at 3713 New Hampshire Avenue and the property at 807 Rock Creek Church Road. The only way to enter or leave the Family Foods Market is by the door which opens onto New Hampshire Avenue.

20. The only way to enter or leave the upstairs apartment at 3713 New Hampshire Avenue is by the first-floor entry which opens onto New Hampshire Avenue. During the construction, the upstairs apartment was either vacant or rented at a rate far below market value.

21. The property at 807 Rock Creek Church Road was rented throughout the construction by a pre-existing tenant, which used it for additional space for its day care center, Tiny Tots, located right next door. The monthly lease amounts were paid in full during the construction period.

22. Plaintiff Francis Fabrizio, Jr., and his wife Sarah, own the four separate properties located at 3701, 3703, 3705, 3707, 3709, and 3711 New Hampshire Avenue, and 811 Rock Creek Church Road. They are designated as Lot 805, Square 3030, and have frontage on both New Hampshire Avenue and Rock Creek Church Road.

23. Plaintiff Carlton Hugh Henry leases from Mr. Fabrizio the property located at 3709–3711 New Hampshire Avenue,

where he runs an electronic repair business called "Hugh Electronics". At the time construction started, Mr. Henry had leases on 3709 and 3711 New Hampshire Avenue until July and August 1997, respectively. In March 1996, Mr. Henry applied to receive a grant from the District of Columbia to recover some of the losses he had suffered from the Metro construction. While the testimony was not entirely clear, it appears that in order to qualify for the grant, he had to show he was operating under a lengthy lease. Therefore, Mr. Henry and Mr. Fabrizio agreed in March 1996 to extend Mr. Henry's leases to 2002. At the time of the extension, both parties believed WMATA's representations that the construction would be completed during the summer of 1997.

24. The property at 811 Rock Creek Road, which is a separate retail space fronting on Rock Creek Church Road, is located in the same building as 3709–3711 New Hampshire Avenue which houses Hugh Electronics. This retail space was continuously occupied by various tenants from 1989 through December 1995, at market rents. The premises were vacant from December, 1995 until April 1, 1996, when Bernard Saunders leased them for a period of five years. Mr. Saunders paid rent for only three months and then vacated the premises. They were not rented again until March 1998, after the construction was completed and the streets were reopened.

25. Plaintiff George Beckford leases from Mr. Fabrizio the property located at 3701–3703–3705 New Hampshire Avenue, where he operates a restaurant called the Sweet Mango Cafe. Mr. Beckford first leased 3701–3703 New Hampshire Avenue for his restaurant in October 1993. Mr. Beckford did well with his restaurant, turned a profit, and paid all his bills. Much of the restaurant's business was carry-out, with many customers coming from Virginia and Maryland, parking on New Hampshire Avenue, and running into Sweet Mango Cafe to pick up their carry-

out food. Those customers usually parked on New Hampshire Avenue or Rock Creek Church Road where the two-hour parking limits gave them plenty of time to purchase their food. The restaurant's success continued until October 1994 when New Hampshire Avenue closed. Within four months, Mr. Beckford's revenues started decreasing until he was no longer able to pay his rent.

26. Mr. Beckford also leased the property at 3705 New Hampshire Avenue with a written lease commencing January 1996. At that time, Mr. Beckford was not paying his full rent for the existing lease on 3701–3703 New Hampshire Avenue. Neither Mr. Fabrizio nor Mr. Beckford expected that the latter would be able to pay the rent for the new space at 3705 New Hampshire Avenue, and in fact Mr. Beckford was not able to. Even though Mr. Beckford's restaurant business was suffering from the effects of the Construction Site, he entered the new lease in order to provide future seating space for his restaurant, after the completion of construction, when he fully expected his business to thrive. At the same time, Mr. Fabrizio knew that because of the Construction Site and the impairment of both vehicular and pedestrian access, he had no hope of leasing the premises at 3705 New Hampshire Avenue to anyone other than Mr. Beckford. Rather than having the property sit vacant, and be easy prey for vandals, he decided to rent it to Mr. Beckford even though he knew Mr. Beckford could not pay the full rent for the three properties at that time.

27. Mr. Beckford and Mr. Fabrizio agreed that during the construction, the former would pay $300 every week and that after the construction they would increase the monthly rent and ultimately make up the full lease amount. Both Mr. Beckford and Mr. Fabrizio clearly understood that the underlying lease obligation remained in effect but was simply deferred until construction was completed and Mr. Beckford's business recovered.

28. Mr. Fabrizio's office rental space at 3707 New Hampshire Avenue was vacant during part of the construction, and then was leased for a portion of the construction for considerably less than market value. The tenant failed to pay the full rent under the lease.

29. Plaintiff America's Cash Express ("ACE") leases the property located at 3663 Georgia Avenue (part of Lot 806, Square 303), which is located on the southeast corner of Georgia Avenue and Rock Creek Church Road. ACE rented the property from Paul David Gwynn and others (owners/lessors who are not plaintiffs in this case) on May 26, 1992 for a period of five years and invested more than $70,-000 in making physical improvements to it.

30. ACE closed the business in December 1995 due to the decrease in revenues resulting from limitations on access and after an armed robbery in which $40,000 was stolen. However, ACE continued to pay the full amount of rent for its property, because of its contractual obligations under the lease.

31. In May 1997, ACE exercised its option to renew its lease from July 1997 to June 2002 for 3663 Georgia Avenue, even though the store was still closed and there was not yet any viable access. The first year's rental under the option was for $1600, well below the fair market value for comparable space where the rents would have been $2000. ACE renewed the lease because of its substantial investment in the store and its belief that construction of the Station would be completed fairly quickly, by September 1997. Prior to construction of the Station and the closing of Georgia Avenue, the store had shown promise.

32. Plaintiff Tewidros Estafanos, and his wife Yordanos Berhane, lease the property at 3661 Georgia Avenue (part of Lot 806, Square 3031) from Paul and Irving Gwynn (owners/lessors who are not plaintiffs in this case) for a period of five years from January 26, 1993 to January 22, 1998. Mr. Estifanos operated a convenience

store with frontage on Georgia Avenue called Asier Daily Grocery. Because of the Construction Site, the inability to get deliveries, and the great difficulty of pedestrian access, Mr. Estifanos was forced to close the store in September 1995.

33. Plaintiff Ghirmai Ghebremichel, and his brother Tedros Ghebremichel (not a plaintiff in this case), lease the property at 3659 Georgia Avenue (part of Lot 806, Square 3031), from Albert D. Maizels (owner/lessor who is not a plaintiff in this case) for a period of five years from January 1, 1995 to December 31, 1999. Mr. Ghebremichel operates a beauty and barber supply store called Georgia Beauty Supply. At the time he acquired the premises for his store, he knew that WMATA was building a subway station in the area, but expected that there would always be reasonable vehicular and pedestrian access to the store as well as a means for receiving deliveries. Because of the presence of the Construction Site, the inability to get deliveries, and the great difficulty of pedestrian access, Mr. Ghebremichel was forced to close his store in 1995.

34. All Plaintiffs, whether owners or renters of their properties, had reasonable expectations that they would be able to use their properties in a reasonably profitable manner, and that they would continue to enjoy the same reasonable access for cars, pedestrians, and the making of deliveries which they had previously enjoyed prior to commencement of the Petworth station construction.

### D. Impact of the Construction on Plaintiffs' Properties and Businesses

35. The lack of pedestrian and vehicular access during the period of construction of the Petworth station severely affected the success and viability of Plaintiffs' businesses. During that period, four of the Plaintiffs were forced to close their businesses because of the sharp decrease in revenues, namely Mr. Mekuria, Mr. Estifanos, Mr. Ghebremichel, and ACE. Even those Plaintiffs who were able to keep their businesses open, Mr. Beckford and Mr. Henry, suffered severely reduced revenues and were able to keep operating in large part because Mr. Fabrizio was willing to accept either reduced rent or none at all.

36. Plaintiffs' real estate appraisal expert, Kevin Curnyn, who had twenty five years' experience in the real estate appraisal and analysis field, estimated the impact on the value of Plaintiffs' property interests resulting from the impairment of access due to construction of the Station. He concluded that the lack of access to the properties reduced their potential retail trade to the point that the properties were no longer economically viable, and that there were no other economically viable uses for them that would not also be impacted by the same accessibility problems. He also concluded that during the construction, the fair market rental value of Plaintiffs' retail properties was reduced to zero, and that the fair market rental value of Plaintiffs' residential properties—the apartments located at 3713 New Hampshire Avenue and at 3707 New Hampshire Avenue—were reduced by 50 percent and 40 percent respectively.

37. In making his calculations, Mr. Curnyn first determined the fair market value for these properties in the absence of any impairment of access; for that figure, he relied on the rental payments required under the leases in place at the time construction started. Mr. Curnyn then determined the fair market rental value of the properties with the impairment of access; for that figure, he estimated what a reasonable person would have paid for these properties during the construction while their access was impaired. He concluded that no reasonable person under normal circumstances would have paid any amount of rent for these retail properties during the period of construction. As the final step, Mr. Curnyn calculated the difference between the fair market rental value without the impairment and the fair market

rental value with the impairment, to arrive at the amount of just compensation to which Plaintiffs would be entitled.

38. The specific losses calculated by Mr. Curnyn are, subject to appropriate discounting and interest calculations, as follows:

a. The impact on the rental value of the first floor retail space at 3713 New Hampshire Avenue due to the impairment of access during the construction was $46,695.

b. The impact on the rental value of the second floor apartment space at 3713 New Hampshire Avenue due to the impairment of access during the construction was $11,700.[2]

c. The impact on the rental value of the retail space at 3709–3711 New Hampshire Avenue due to the impairment of access during the construction was $79,672.[3]

d. The impact on the rental value of the retail space at 3701–3703–3705 New Hampshire avenue due to the impairment of access during the construction was $77,496.[4]

e. The impact on the rental value of the office space at 3707 New Hampshire Avenue due to the impairment of access during the construction was $7,800.

f. The impact on the rental value of the retail space at 811 Rock Creek Church Road due to the impairment of access during the construction was $18,525.

g. The impact of the rental value of the retail space at 3663 Georgia Avenue due to the impairment of access during the construction was $78,841.[5]

h. The impact of the rental value of the retail space at 3661 Georgia Avenue due to the impairment of access during the construction was $35,949.[6]

i. The impact of the rental value of the retail space at 3659 Georgia Avenue due to the impairment of access during the construction was $6000.

## II. Conclusions of Law

### A. Governing Legal Principles

■ Plaintiffs bring this suit pursuant to the Fifth and Fourteenth Amendments to the United States Constitution. The Fifth Amendment provides that no "private property shall be taken for public use without just compensation." U.S. Const. amend. V. Where, as here, Plaintiffs have not alleged physical intrusion upon their properties, the claim must be analyzed as a regulatory taking, or inverse condemnation.

■ The Supreme Court set forth the now familiar standard for takings claims in *Penn Central Transp. Co. v. New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). There, the Supreme Court recognized the difficulty in developing a " 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Id.* at 124, 98 S.Ct. 2646 (citations omitted). The Court nevertheless identified several factors which have

---

2. It is interesting to note that the expert appraiser retained by WMATA, who adopted the same basic analytic approach as Mr. Curnyn, estimated the diminution of rental value on the Mekuria properties due to impairment of access to be $50,630.

3. WMATA's appraiser estimated the diminution of rental value on the Henry leasehold to be $33,135.

4. WMATA's appraiser estimated the diminution in rental value on the entire Fabrizio parcel to be $42,768. WMATA's appraiser estimated the diminution in rental value on the Beckford leasehold to be $27,726.

5. WMATA's appraiser estimated the diminution in rental value to the ACE leasehold to be $57,352.

6. WMATA's appraiser estimated the diminution in rental value to the Estifanos leasehold to be $22,81.

"particular significance" in identifying when a taking has occurred. *Id.* In particular, courts should consider: 1) the character of the government action; 2) the economic impact of the action upon the property owner; and 3) the extent to which the regulation has interfered with the property owners' distinct investment-backed expectations.[7]

## B. Analysis

### 1. Character of the Government Action

■ The evidence adduced at trial established that WMATA's actions destroyed all reasonable access to Plaintiffs' properties. The WMATA construction, which spanned approximately three years, closed all traffic on the 3700 block of New Hampshire Avenue. During that same span of time, vehicle access to Rock Creek Church Road from New Hampshire Avenue was also blocked. The resulting conditions impeded all direct vehicular access to those of Plaintiffs' properties that fronted on New Hampshire Avenue. Furthermore, in the period from March 1995 to August 1997, WMATA placed barriers on the 3600 block of Georgia Avenue, thus blocking direct street access to those of Plaintiffs' properties fronting that street.

In lieu of direct traffic routes, WMATA constructed a rear access route ending in a "turnaround" on Rock Creek Church Road to provide delivery access. The access route was, however, quite circuitous. WMATA failed to post any signs indicating the existence of the "turnaround" or explaining the direction of the access route. One defense witness in fact testified that "you had to know about it [the access route] or stumble on it."

Delivery trucks and patrons who were able to navigate the rear access route faced an additional hurdle. During the entire period of construction, it was illegal to park or stop on the "turnaround" on Rock Creek Church Road. Furthermore, WMATA represented to the public that the "turnaround" would be 50 feet wide, thus permitting passage by a standard-size delivery truck. In actuality, the "turnaround" measured, at most, 42 feet wide. The illegal parking and narrow width of the "turnaround" simply failed to provide adequate access for patrons and deliveries. Plaintiffs' businesses suffered as a direct result.

In addition to the circuitous vehicular traffic route, the WMATA construction created impediments to pedestrian traffic as well. Throughout the period of construction, the pedestrian sidewalk in front of Plaintiffs' properties ranged from fifteen feet at its widest to three feet at its narrowest. While determined pedestrians could still access Plaintiffs' properties, large portions of the uneven sidewalk were marked with holes, depressions, and chunks of broken concrete, such that the walkway posed a significant hindrance to foot traffic.

### 2. Economic Impact of WMATA's Construction

The second prong of the *Penn Central* test requires evaluation of the economic impact of WMATA's construction on Plaintiffs' property interests. Upon review of the evidence produced at trial, the Court concludes that WMATA's actions inflicted serious economic harm on Plaintiffs' properties and businesses.

The Court has made numerous findings of fact as to the economic impact upon

---

7. The Supreme Court provided an alternate test to the three-pronged *Penn Central* analysis in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). There, the Court determined that "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property eco-

nomically idle, he has suffered a taking." *Id.* at 1019, 112 S.Ct. 2886.

While Plaintiffs attempted to demonstrate at trial that their properties were deprived of all economically beneficial use, the Court need not make that determination. Having determined that WMATA's construction meets the *Penn Central* test for a taking, the Court need proceed no further.

Plaintiffs' businesses, and need not repeat those findings here. It is sufficient to emphasize that Plaintiffs Estafanos, Ace Cash, Mekuria, and Ghebremichel were forced to close their respective businesses after their clientele dwindled in the face of construction barriers. Plaintiffs Beckford and Henry, while still operating their businesses, suffered significant economic losses, such that they were unable to pay a large percentage of their rent. Likewise, Plaintiff Fabrizio sustained significant losses in rental payments as a result of his tenants' failing businesses.

### 3. Investment–Backed Expectations

The third prong of *Penn Central* concerns the interference of WMATA's actions with Plaintiffs' distinct investment-backed expectations. Here, Defendant makes much of the fact that Plaintiffs Estafanos and Beckford operated their businesses with minimal business returns before WMATA ever began construction. The earlier history of mediocre returns, Defendant argues, precludes those Plaintiffs from asserting any investment-backed expectations.

Defendant's argument, however, represents far too narrow a view of investment-backed expectation. Plaintiffs specifically located in an area with two busy thoroughfares. Regardless of whether all the businesses were economic successes, they were nevertheless viable existing companies that were at least breaking even until construction began. Furthermore, Plaintiffs expected that they and their patrons would have reasonable vehicular and pedestrian access to their businesses. WMATA's extensive construction directly interfered with that expectation.

8. Parties failed to produce any evidence at trial as to the expected date of completion, other than the broad period of summer 1997. Since summer is generally considered to include June, July, and August, the Court will consider July 17, 1997 as the expected date of completion for purposes of calculating damages.

There is, however, a significant exception to some Plaintiffs' right to compensation. Plaintiffs Fabrizio and Mekuria clearly had, at all times, a reasonable expectation of access to their properties. As Defendant argues, however, Plaintiffs Ace Cash, Beckford, and Henry renewed their leases during the period of construction, and could not, therefore, have had at that point the same expectations of reasonable access.

Defendant's rationale is sound to a certain extent. WMATA represented to Plaintiffs that construction would be completed by summer 1997.[8] New Hampshire Avenue, however, was not actually reopened until December 21, 1997. When renewing their leases, Plaintiffs Ace Cash, Henry, and Beckford could not have had a reasonable expectation of access from the date of renewal through summer 1997, since they knew at the time of renewal that construction would be taking place throughout that period. Therefore, no taking occurred during that period. Those Plaintiffs did, however, have investment-backed expectations of access for the period from summer 1997 to December 21, 1997, which were otherwise impeded by WMATA's construction.[9]

### 4. Segmentation

The Supreme Court stated in *Penn Central*:

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference

9. Plaintiff Henry renewed his lease in March 1996. Plaintiff Beckford renewed his lease in December 1996. Plaintiff Ace Cash renewed its lease in May 1997.

with rights in the parcel as a whole.... 438 U.S. at 130, 98 S.Ct. 2646.

Defendant seizes upon this language to argue that Plaintiffs Fabrizio and Mekuria are precluded from recovery.

■ WMATA argues that Plaintiffs Fabrizio and Mekuria have taken their individual parcels, Lots 805 and 806, respectively, and subdivided them for takings purposes. Plaintiffs concede that they hold one deed to each of their respective properties, and pay taxes on a single parcel. They argue, however, that each of the properties located on Lots 805 and 806 are individually recognized legal parcels.

Defendant's overly-restrictive interpretation of "parcel as a whole" is flawed. The Supreme Court instructed in *Lucas* that the proper definition of a particular parcel:

> may lie in how the owner's reasonable expectations have been shaped by the State's law of property—i.e., whether and to what degree the State's law has accorded legal recognition and protection to the particular interest in land with respect to which the takings claimant alleges a diminution in (or elimination of) value. 505 U.S. at 1016 n. 7, 112 S.Ct. 2886.

The evidence presented at trial demonstrated that each of the properties on Lots 805 and 806, with the exception of Plaintiff Mekuria's convenience store, was subject to individual leases at all times throughout the pendency of construction. Significantly, each property had a separate mailing address recognized by the District of Columbia, and each property maintained separate utilities. Furthermore, each property was physically separated from others, with no access between properties other than their front and rear entrances. Plaintiff Fabrizio also testified at trial that Lots 805 and 806 fell in the category of "800 series" lots. This parcel designation was created by the District of Columbia by combining formerly separate lots primarily for efficiency in taxation.

Given the many indications of independent existence, the Court rejects Defendant's claim that Plaintiffs Fabrizio and Mekuria improperly segmented their properties for takings purposes.

### 5. Valuation

Having determined that WMATA's actions satisfy the *Penn Central* test for takings, the Court now turns to the matter of just compensation.

■ Here, WMATA's actions effected a temporary taking of Plaintiffs' properties. The principle is well settled that "[t]he usual measure of just compensation for a temporary taking ... is the fair rental value of the property for the period of the taking." *Yuba Natural Resources, Inc. v. U.S.*, 904 F.2d 1577, 1581 (Fed.Cir. 1990). In this case, Plaintiffs' expert calculated the fair market rental value by comparing the rental values of the relevant properties with and without reasonable access. The expert relied primarily upon the lease agreements which were in place prior to commencement of construction—the best indicator of the properties' fair market rental value with reasonable access. He then estimated the rental value for the properties during construction, concluding that a reasonable person would not have paid any more than half of the rental value on the residential units, and no amount to rent the commercial properties. The difference in the rental values with and without access represent Plaintiffs' total rental losses.

■ Courts have further concluded that "[t]o provide the full value of the property taken, just compensation includes interest on the property, expenses and fees." *Shelden v. U.S.*, 34 Fed.Cl. 355, 377 (1995); *see also Dow Chemical Co. v. United States*, 36 Fed.Cl. 15, 27–28 (1996). To fully compensate Plaintiffs' losses, then, Defendant is obligated to pay compounded "interest as of the date the forfeiture became effective until the date the government tenders final payment...." *Id.* at 378. Generally, "the choice of an appro-

priate rate of interest is a question of fact, to be determined by the court.... In fixing an award of interest, the district court should attempt to determine what 'a reasonably prudent person investing funds so as to produce a reasonable return while maintaining safety of principal' would have achieved." *Washington Metro. Area Transit Auth. v. One Parcel of Land in Montgomery County, Maryland,* 706 F.2d 1312, 1322 (4th Cir.1983) (citation omitted).

Parties presented no evidence at trial as to an appropriate rate of interest on Plaintiffs' losses. The Court will therefore reserve judgment on the rate of interest pending parties' submissions on that matter.

### III. Conclusion

Plaintiffs have, with one exception, established a taking under the three-prong *Penn Central* test. The weight of the evidence produced at trial demonstrated that WMATA's construction unreasonably hindered access to each Plaintiff's property, thereby impacting the property interests to such a drastic degree that several were forced to close their businesses. Those who continued operating their businesses suffered large economic losses.

Plaintiffs further demonstrated that WMATA's actions interfered with their distinct investment-backed expectations. Plaintiffs Fabrizio and Mekuria purchased their properties fully expecting that they, their customers, their tenants, and their suppliers would always have access. Plaintiffs Ghebremichel, Henry, Beckford, Estafanos, and Ace Cash similarly, leased properties and opened businesses with the expectation that customers would be able to reach them.

The one period of exception, during which no taking occurred, applies to Plaintiffs Ace Cash, Henry, and Beckford who renewed their leases during the construction, when access was already being impeded. From the date of each lease renewal to July 15, 1997, those Plaintiffs knew of the construction impediments, and cannot therefore establish interference with investment-backed expectations. No taking occurred during those specific periods. Those Plaintiffs are entitled, however, to compensation for the period between the start of construction and the date of lease renewal, as well as the period from July 16, 1997 to December 21, 1997, when construction was completed.

The Court therefore concludes that Plaintiffs were subjected to takings in violation of the Fifth and Fourteenth Amendments, and are entitled to just compensation.

Parties are to submit no later than April 15, 1999, proposed calculations consistent with the Court's Memorandum Opinion, which are to include the appropriate discount and interest rates. The Court strongly urges the parties to present calculations on which they agree without in any way compromising their position on issues of liability.

■ A separate Order will accompany this Memorandum Opinion.[10]

---

**10.** Parties and counsel are reminded that motions for reconsideration will not be granted unless the district court finds "that there is an 'intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Firestone v. Firestone,* 76 F.3d 1205, 1208 (D.C.Cir.1996). Consequently, counsel are urged not to file motions for reconsideration unless fully justified under the *Firestone* standard. The Court *will* consider Rule 11 sanctions for frivolous motions which merely waste everyone's time by repeating arguments which have already been rejected.